UNITED STATES v. ADDYSTON PIPE & STEEL CO. et al.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1898.)

No. 498.

1. MONOPOLIES—CONTRACTS IN RESTRAINT OF TRADE—COMBINATIONS.
    Contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal, or as giving rise to an action for damages to one prejudicially affected thereby, but were simply void, and not enforceable. The effect of the anti-trust law of 1890 is to render such

contracts, as applied to interstate commerce, unlawful in an affirmative or positive sense, and punishable as a misdemeanor, and also to create a right of civil action for damages in favor of persons injured thereby, and a remedy by injunction in favor both of private persons and the public against the execution of such contracts and the maintenance of such trade restraints.

2. SAME—RESTRAINTS LAWFUL AT COMMON LAW.
   No contractual restraint of trade is enforceable at common law unless the covenant embodying it is merely ancillary to some lawful contract (involving some such relations as vendor and vendee, partnership, employer and employè), and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard for determining the reasonableness and validity of the restraints. But where the sole object of both parties in making the contract is merely to restrain competition, and enhance and maintain prices, the contract is void.

3. SAME—"ANTI-TRUST" LAW.
   A number of companies manufacturing iron pipe in different states formed a combination whereby the territory in which they operated (comprising a large part of the United States) was divided into "reserved" cities and "pay" territory. The reserved cities were allotted to particular members of the combination, free of competition from the others, though provision was made for pretended bids by the latter at prices previously arranged. In the pay territory all offers to purchase pipe were submitted to a committee, which determined the price, and then awarded the contract to that member of the combination which agreed to pay the largest "bonus" to be divided among the others. Held, that this was an unlawful combination, both at common law and under the act of 1890, against trusts and monopolies. 78 Fed. 712, reversed.

4. SAME—CONTRACTS IN RESTRAINT OF INTERSTATE COMMERCE.
   Contracts which operate as a restraint upon the soliciting of orders for, and the sale of, goods in one state, to be delivered from another, are contracts in restraint of interstate commerce, within the meaning of the act of July 2, 1890. U. S. v, E. C. Knight Co., 15 Sup. Ct. 249, 156 U. S. 1, distinguished.

5. SAME—SUIT IN EQUITY—FORFEITURE OF GOODS.
   In a suit in equity brought by the United States to enjoin the carrying out of a contract or combination in restraint of interstate commerce, under the act of 1890, there can be no seizure of goods in course of transportation pursuant to the unlawful contract. Such seizure can only be made under the sixth section of the act, which authorizes seizures and condemnation by like proceedings to those provided in cases of property imported into the United States contrary to law.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This was a proceeding in equity, begun by petition filed by the attorney general, on behalf of the United States, against six corporations engaged in the manufacture of cast-iron pipe, charging them with a combination and conspiracy in unlawful restraint of interstate commerce in such pipe, in violation of the so-called "Anti-Trust Law," passed by congress July 2, 1890. The defendants were the Addyston Pipe & Steel Company, of Cincinnati, Ohio; Dennis Long & Co., of Louisville, Ky.; the Howard-Harrison Iron Company, of Bessemer, Ala.; the Anniston Pipe & Foundry Company, of Anniston, Ala.; the South Pittsburg Pipe Works, of South Pittsburg, Tenn.; and the Chattanooga Foundry & Pipe Works, of Chattanooga, Tenn. The petition prayed that all pipe sold and transported from one state to another, under the combination and conspiracy described therein, be forfeited to the petitioner, and be seized and confiscated in the manner provided by law, and that a decree be entered dissolving the unlawful conspiracy of defendants, and perpetually enjoining them from operating under the same, and from selling said cast-iron pipe in accordance therewith to be transported from one state into another. The defendants filed a joint and separate demurrer to the petition in so far as it prayed for the confiscation of

goods in transit, on the ground that such proceedings, under the anti-trust act, are not to be had in a court of equity, but in a court of law. In addition to the demurrer, the defendants filed a joint and separate answer, in which they admitted the existence of an association between them for the purpose of avoiding the great losses they would otherwise sustain, due to ruinous competition between defendants, but denied that their association was in restraint of trade, state or interstate, or that it was organized to create a monopoly, and denied it was a violation of the anti-trust act of congress. Testimony in the form of affidavits was submitted by petitioner and defendants, and, by stipulation, it was agreed that the final hearing might be had thereon. Judge Clark, who presided in the circuit court, dismissed the petition on the merits. His opinion is reported in 78 Fed. 712.

From the minutes of the association, a copy of which was put in evidence by the petitioner, it appeared that prior to December 28, 1894, the Anniston Company, the Howard-Harrison Company, the Chattanooga Company, and the South Pittsburg Company had been associated as the Southern Associated Pipe Works. Upon that date the Addyston Company and Dennis Long & Co. were admitted to membership, and the following plan was then adopted:

"First. The bonuses on the first 90,000 tons of pipe secured in any territory, 16″ and smaller, shall be divided equally among six shops. Second. The bonuses on the next 75,000 tons, 30″ and smaller sizes, to be divided among five shops, South Pittsburg not participating. Third. The bonuses on the next 40,000 tons, 36″ and smaller sizes, to be divided among four shops, Anniston and South Pittsburg not participating. Fourth. The bonuses on the next 15,000 tons, consisting of all sizes of pipe, shall be divided among three shops, Chattanooga, South Pittsburg, and Anniston not participating. The above division is based on the following tonnage of capacity: South Pittsburg, 15,000 tons; Anniston, 30,000 tons; Chattanooga, 40,000 tons; Bessemer, 45,000 tons; Louisville, 45,000 tons; Cincinnati, 45,000 tons. When the 220,000 tons have been made and shipped, and the bonuses divided as hereinafter provided, the auditor shall set aside into a reserve fund all bonuses arising from the excess of shipments over 220,000 tons, and shall divide the same at the end of the year among the respective companies according to the percentage of the excess of tonnage they may have shipped (of the sizes made by them) either in pay or free territory. It is also the intention of this proposition that the bonuses on all pipe larger than 36 inches in diameter shall be divided equally between the Addyston Pipe & Steel Company, Dennis Long & Co., and the Howard-Harrison Company."

"It was thereupon resolved: First. That this agreement shall last for two years from the date of the signing of same, until December 31, 1896. Second. On any question coming before the association requiring a vote, it shall take five affirmative votes thereon to carry said question, each member of this association being entitled to but one vote. Third. The Addyston Pipe & Steel Company shall handle the business of the gas and water companies of Cincinnati, Ohio, Covington, and Newport, Ky., and pay the bonus hereafter mentioned, and the balance of the parties to this agreement shall bid on such work such reasonable prices as they shall dictate. Fourth. Dennis Long & Company, of Louisville, Ky., shall handle Louisville, Ky., Jeffersonville, Ind., and New Albany, Ind., furnishing all the pipe for gas and water works in above-named cities. Fifth. The Anniston Pipe & Foundry Company shall handle Anniston, Ala., and Atlanta, Ga., furnishing all pipe for gas and water companies in above-named cities. Sixth. The Chattanooga Foundry & Pipe Works shall handle Chattanooga, Tenn., and New Orleans, La., furnishing all gas and water pipe in the above-named cities. Seventh. The Howard-Harrison Iron Company shall handle Bessemer and Birmingham, Ala., and St. Louis, Mo., furnishing all pipe for gas and water companies in the above-named cities; extra bonus to be put on East St. Louis and Madison, Ill., so as to protect the prices named for St. Louis, Mo. Eighth. South Pittsburg Pipe Works shall handle Omaha, Neb., on all sizes required by that city during the year of 1895, conferring with the other companies and co-operating with them. Thereafter they shall handle the gas and water companies of Omaha, Neb., on such sizes as they make.

"Note: It is understood that all the shops who are members of this association shall handle the business of the gas and water companies of the cities set apart for them, including all sizes of pipe made by them.

85 F.—18

"The following bonuses were adopted for the different states as named below: All railroad or culvert pipe or pipe for any drainage or sewerage purposes on 12″ and larger sizes shipped into bonus territory shall pay a bonus of $1.00 per ton. On all sizes below 12″ and shipped into 'bonus territory' for the purposes above named, there shall be a bonus of $2.00 per ton.

### List of Bonuses.

| | | |
|---|---|---|
| Alabama | $3 00 | Wyoming ... $4 00 | Michigan ... $1 50 |

| | | |
|---|---|---|
| Alabama ................$3 00 | Wyoming ............$4 00 | Michigan.............$1 50 |
| B'gham, Ala .......... 2 00 | Oregon............... 1 00 | West Va.............. 1 00 |
| Anniston, Ala........ 2 00 | Ohio.................. 1 50 | Kansas ............ 2 00 |
| Mobile, Ala...... .... 1 00 | N. D.................. 2 00 | Ky....... ............ 2 00 |
| Arizona Ter.......... 3 00 | S. D.................. 2 00 | La..................... 3 00 |
| California............ 1 00 | Florida............... 1 00 | Miss.................. 4 00 |
| Colorado ............. 2 00 | Georgia .............. 2 00 | Mo . .................. 2 00 |
| Ind. Ter.. ........... 3 00 | Atlanta, Ga.......... 2 00 | Montana ............. 3 00 |
| North C.............. 1 00 | Ga. Coast Pts........ 1 00 | Nebraska ............. 3 00 |
| Tenn., East of C'land.. 2 00 | Idaho.................. 2 00 | N. Mex...... ........ 3 00 |
| Tenn., Middle and West............... 3 00 | Nev .................. 3 00 | S. C.................. 1 00 |
| Illinois, except Madison and East St. Louis, as previously provided......... 2 00 | Oklahoma............. 3 00 | Minn................. 2 00 |
| | Wis .................. 2 00 | Utah ................. 4 00 |
| | Texas, Interior....... 3 00 | Indiana............... 2 00 |
| | Texas Coast.......... 1 00 | Iowa .................. 2 00 |
| | Wash'ton Ter........ 1 00 | |

"All other territory free.

"On motion of Mr. Llewellyn, the bonuses on all city work as specially reserved shall be $2.00 per ton."

The states, for sales in which, bonuses had to be paid into the association were called "pay" territory, as distinguished from "free" territory, in which defendants were at liberty to make sales without restriction and without paying any bonus. The by-laws provided for an auditor of the association, whose duty it was to keep account of the business done by each shop both in pay and free territory. On the 1st and 16th of each month, he was required to send to each shop "a statement of all shipments reported in the previous half month, with a balance sheet showing the total amount of the premiums on shipments, the division of the same, and debit, credit, balance of each company." The system of bonuses, as a means of restricting competition and maintaining prices, was not successful. A change was therefore made by which prices were to be fixed for each contract by the association, and, except in reserved cities, the bidder was determined by competitive bidding of the members; the one agreeing to give the highest bonus for division among the others getting the contract. The plan was embodied in a resolution passed May 27, 1895, in the words following: "Whereas, the system now in operation in this association of having a fixed bonus on the several states has not, in its operation, resulted in the advancement in the prices of pipe, as was anticipated, except in reserved cities, and some further action is imperatively necessary in order to accomplish the ends for which this association was formed: Therefore, be it resolved, that from and after the first day of June, that all competition on the pipe lettings shall take place among the various pipe shops prior to the said letting. To accomplish this purpose it is proposed that the six competitive shops have a representative board located at some central city, to whom all inquiries for pipe shall be referred, and said board shall fix the price at which said pipe shall be sold, and bids taken from the respective shops for the privilege of handling the order, and the party securing the order shall have the protection of all the other shops." In pursuance of the new plan, it was further agreed "that all parties to this association, having quotations out, shall notify their customers that the same will be withdrawn by June 1, 1895, if not previously accepted, and upon all business accepted on and after June 1st bonuses shall be fixed by the committee." At the meeting of December 19, 1895, it was moved and carried that, upon all inquiries for prices from "reserved cities" for pipe required during the year of 1896, prices and bonuses should be fixed at a regular or called meeting of the principals. At the meeting of December 20, 1895, the plan for division of bonuses originally adopted was modified by making the basis the total amounts shipped into "pay" territory rather than the totals shipped into "pay" and "free" territory.

To illustrate the mode of doing business, the following excerpt from the minutes of the meetings of December 20, 1895, February 14, 1896, and March 13, 1896, is given: "It was moved to sell the 519 pieces of 20" pipe from Omaha, Neb., for $23.10, delivered. Carried. It was moved that Anniston participate in the bonus, and the job be sold over the table. Carried. Pursuant to the motion, the 519 pieces of 20" pipe for Omaha was sold to Bessemer at a premium of $8." "Moved that 'bonus' on Anniston's Atlanta Waterworks contract be fixed at $7.10, provided freight is $1.60 a ton. Carried." An illustration of the manner in which "reserved" cities were dealt with may be seen in the case of a public letting at St. Louis. On February 4, 1896, the water department of that city let bids for 2,800 tons of pipe. St. Louis was "reserved" to the Howard-Harrison Company, of Bessemer, Ala. The price was fixed by the association at $24 a ton, and the bonus at $6.50. Before the letting, the vice president of this company, wrote to the other members of the association, under date of January 24, 1896, as follows: "I write to say that, in view of the fact that I do not as yet know what the drayage will be on this pipe, I prefer that, if any of you find it necessary to put in a bid without going to St. Louis, please bid not less than $27 for the pipe, and 2¾ cents per pound for the specials. I would also like to know as to which of you would find it convenient to have a representative at the letting. It will be necessary to have two outside bidders." The contract was let to the Howard-Harrison Company, of Bessemer, at $24, who allowed the Shickle, Harrison & Howard Company, a pipe company of St. Louis, not in the association, but having the same president as the Howard-Harrison Company, of Bessemer, to fill part of the order. The only other bidders were the Addyston Pipe & Steel Company and Dennis Long & Co., the former bidding $24.37, and the latter $21.57. The evidence shows that the Chattanooga Foundry could have furnished this pipe, delivered in St. Louis, at from $17 to $18, and could have made a profit on it at that price. The record is full of instances of a similar kind, in which, after the successful bidder had been fixed by the "auction pool," or had been fixed by the arrangement as to "reserve" cities, the other defendants put in bids at the public letting as high as the selected bidder requested, in order to give the appearance of active competition between defendants.

In January, 1896, after the auction pool had been in operation for more than six months, the Chattanooga Company wrote a letter to its representative in the central committee to outline its policy for the new year, and the statements of the letter cast much light on the prices bid and the character of bonuses fixed. The letter is dated January 2, 1896, and is as follows: "Dear Sir: Referring to our policy for 1896, in bidding on pipe, we have had this matter under consideration for some time past, and from the information obtained from Mr. Thornton's statement, as to the amount of business done last year in pay territory, and from estimates that we have made for business that will come into that territory for 1896, we have been able to determine to what point we could bid on work and take contracts, and, if bonus is forced above this point, let it go and take the bonus. We note from your letter of yesterday that you have sized up the situation in its essential points, and it agrees exactly with our ideas on the subject. It is useless to argue that Howard-Harrison Iron Co., Cincinnati, and other shops, who have been bidding bonuses of $6 or $8 per ton, can come out and make any money if they continue to bid such bonus. In the case of the Howard-Harrison Iron Co. people, on Jacksonville, Fla., the truth of the business is they are losing money at the prices they bid for this work. If they take the contract at $19 delivered, it will only net $16 at the shop after they have paid back the bonus of $4.75. If they should continue to buy all the pipe that goes up to such figures as they have paid for Jacksonville and other points, they would wreck their shop in a few months. However, they, of course, calculate this bonus will be returned to them on work taken by other shops. We are very much pleased with the bonus that has been paid, and we only hope they will keep it up, as it is only money in our pockets. As long as there is no money to us, let them make the pipe, as we shall continue to do so. For the present you will adopt the following basis: On 16" and under standard weights, $14.25 at shop; on 18" and 36" standard weights, $13; on 16" and under light weights, $14.50 to $14.75 at shop. That is, you will bid all over $13, $14.25 and $14.50 on work. If we get work at these prices, it will be satisfactory. If the others run bonus above this point, let them take it, as it will be more

money to us to take the bonus. We note Mr. Thornton's report of average premiums from June 1st to December, that the average was $3.63. The average bonuses that are prevailing to-day are $7 to $8. We cannot expect this to continue; and we think your estimate of $6 ton average bonus is high, as we do not believe the premiums for '96 will average that price, unless there is a decided change for the better in business. We find there was sold and shipped into 'pay territory' from January 1, 1895, to date, including the 40,000 tons of old business that did not pay a bonus, about 188,000 tons; and we think a very conservative estimate of shipments into this territory will amount to fully 200,000 this year; more than that, probably overrun 240,000 tons, from the fact that the city of Chicago and several other places that annually use large quantities of pipe were not in the market last year or last season, from the fact that they were out of funds. On the basis as given you above, if the demand should reach 220,000 tons, which would give us our entire 40,000 tons, provided we did no business, then the association would pay us the average 'bonus,' which might be from $3.50 to $5 on our 40,000. If we cannot secure business in 'pay territory' at paying prices, we think we will be able to dispose of our output in 'free territory,' and, of course, make some profit on that. At the prices that Howard-Harrison people paid for Jacksonville, Des Plaines, and one or two other points, they are losing from $2.50 to $3 per ton; that is, provided 'bonuses' would not be returned to them. Therefore, when business goes at a loss, we are willing that other shops make it."

Another letter written by the same company, pending a trouble over a letting at Atlanta, is significant. The Anniston Company, to whom Atlanta had been "reserved," made its bid so high ($24) that a Philadelphia pipe firm, R. D. Wood & Co., had been able to underbid the Anniston Company in spite of difference in freights. All the bids had been rejected as too high, and, upon a second letting, Anniston's bid was $1.25 a ton less, and the job was awarded to it. The charge was then made by Atlanta persons that there was a "trust" or "combine." This was vigorously denied. The letter of the Chattanooga Company evoked by this difficulty was dated February 25, 1896, and read as follows: "Gentlemen: We are in receipt of a carbon copy of your favor of the 24th instant, to F. B. Nichols, V. P., in reference to Atlanta, Ga. We certainly regret that the matter has assumed its present shape and that R. D. Wood & Company should make a lower bid by one dollar a ton that the Southern shops. You know we have always been opposed to special customers and 'reserved cities.' We do not think that it is the right principle, and we believe, if the present association continues, that all special customers and reserved cities should be wiped out. There is no good reason why we should be allowed to handle New Orleans; you, Atlanta; Howard-Harrison Iron Co., St. Louis; or South Pittsburg, Omaha. We are not in the business to award special privileges to any foundry, and we believe that the result would be more benefit to all concerned if all business was made competitive. It is hardly right, and we believe, if you will think over the matter carefully, you will concede it, for us to be put into a position of being unable to make prices or furnish pipe for the city of Atlanta, when we have always heretofore had a large share of their trade. We cannot explain our position to the Atlanta people, and we consider it is detrimental to our business, and think no combination should have the power to force us into such a position. The same argument will apply with you as to New Orleans, St. Louis, and other places. We think this matter should be considered seriously, and some action taken that will result in reestablishing ourselves (I mean the four Southern shops) in the confidence of the Atlanta people. Wistar, R. D. Wood & Company's man, has no doubt told them all about our association, or as much as he could guess, and has worked up a very bitter feeling against us. The very fact that you have been protected, and have had all their business for the past two years, is proof to them that such a 'combination' exists; and they state that, if they find out positively that we are working together, they will never receive a bid from any one of us again. We cannot afford to leave these people under that impression, and something ought to be done that would disprove Mr. Wistar's statement to them. We believe that all business ought to be competitive. The fact that certain shops have certain cities 'reserved' is all based upon mere sentiment, and no good reason exists why it should be so. We believe that, as a general thing, we have had our prices entirely too high, and especially do we believe this has been the

case as to prices in reserved cities. The prices made at St. Louis and Atlanta are entirely out of all reason, and the result has been, and always will be, when high prices are named, to create a bad feeling and an agitation against the combination. There is no reason why Atlanta, New Orleans, St. Louis, or Omaha should be made to pay higher prices for their pipe than other places near them, who do not use anything like the amount of pipe, and whose trade is not as desirable for many other reasons. There is no sentiment existing with us in reference to Atlanta, as we would as soon sell our pipe anywhere else, only, as stated above, it is wrong in principle that we should be forced to give up Atlanta or any other point for no good reason that we know of."

It appears quite clearly from the prices at which the Chattanooga and the South Pittsburg Companies offered pipe in free territory that any price which would net them from $13 to $15 a ton at their foundries would give them a profit. Pipe was freely offered by the defendants in free territory more than 500 miles from their foundries at less prices than their representative board fixed prices for jobs let in cities in pay territory nearer to defendants' foundries by 300 miles or more. The defendants adduced many affidavits of a formal type, chiefly from persons who had been buying pipe from defendants and other companies, who testified in a general way that the prices at which the pipe had been offered by defendants all over the country had been reasonable; but in not one of the affidavits was any attempt made to give figures as to cost of production and freight, and in not a single case were the specific instances shown by the evidence for the petitioner disputed. The evidence as to the capacity of the defendants' mills is by no means satisfactory. The division of bonuses was based on an aggregate yearly output of 220,000 tons, but there are averments in the answer that indicate that this was not a statement of the actual limit of capacity, but was only taken as a standard of restricted output upon which to calculate an equitable division of bonuses. Nowhere in the large mass of affidavits is there any statement of the per diem capacity of defendants' mills. Taking their aggregate capacity, however, as 220,000 tons, that of the other mills in the pay territory was 170,500 tons, and that of the mills in free territory was 348,000 tons, according to the affidavit of the chief officer of one of defendants. Of the nonassociation mills in the pay territory, one was at Pueblo, Colo., another was in the state penitentiary at Waco, Tex., and a third in Oregon. Their aggregate annual capacity was 45,500 tons. Another nonassociation mill was the Shickle, Howard & Harrison mill of St. Louis, Mo., with a capacity of 12,000 tons. John W. Harrison, who was president of this company, was also president of the Howard-Harrison mill of Bessemer, Ala., which was a member of the association; and it appears that an order taken by the Bessemer mill at St. Louis was partly filled by the St. Louis mill. The other mills in the pay territory were one at Columbus, Ohio, with an annual capacity of 30,000 tons: one at Cleveland, Ohio, of 60,000 tons; one at Newcomerstown, in northeastern Ohio, of 8,000 tons; and one at Detroit, Mich., of 15,000 tons; and their aggregate annual capacity was 113,000 tons. In the free territory there was one mill in eastern Virginia, with an annual capacity of 16,000 tons; four mills in eastern Pennsylvania, with a capacity of 87,000 tons; three mills in New Jersey, with a capacity of 210,000 tons; and two mills in New York, one at Utica, and another at Buffalo, with an aggregate capacity of 35,000 tons. The evidence was scanty as to rates of freight upon iron pipes, but enough appeared to show that the advantage in freight rates which the defendants had over the large pipe foundries in New York, eastern Pennsylvania, and New Jersey in bidding on contracts to deliver pipe in nearly all of the pay territory varied from $2 to $6 a ton, according to the location. The defendants filed the affidavits of their managing officers, in which they stated generally that the object of their association was not to raise prices beyond what was reasonable, but only to prevent ruinous competition between defendants, which would have carried prices far below a reasonable point; that the bonuses charged were not exorbitant profits and additions to a reasonable price, but they were deductions from a reasonable price, in the nature of a penalty or burden intended to curb the natural disposition of each member to get all the business possible, and more than his due proportion; that the prices fixed by the association were always reasonable, and were always fixed, as they must have been, with reference to the very active competition of other pipe manufacturers for every job; that the reason why they sold pipe at so much cheaper rates in the free territory than in the

pay territory was because they were willing to sell at a loss to keep their mills. going rather than to stop them; that the prices at a city like St. Louis in which the specifications were detailed and precise, were higher because pipe had to be made especially for the job, and they could not use stock on hand. The defendants devoted a good deal of evidence to showing that the stenographer who furnished copies of the minutes of the association and of the correspondence between the members had a pecuniary motive in thus betraying the confidence of his employers; but no evidence was offered by them to contradict any statements made by him, or to impeach the accuracy of the copies he has produced. On one point alone was he contradicted, and that was in his statement that the bonuses represented the increase over and above a reasonable price made possible by the combination of the defendants.

J. H. Bible and Edward B. Whitney, for the United States.

Frank Spurlock, for appellees.

Before HARLAN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The first section of the act of congress entitled "An act to protect trade and commerce against unlawful restraints and monopolies," passed July 2, 1890 (26 Stat. 209), declares illegal "every contract, combination in the form of trust or otherwise or conspiracy in restraint of trade or commerce among the several states or with foreign nations." The second section makes it a misdemeanor for any person to monopolize, or attempt to monopolize, or combine or conspire with others to monopolize, any part of the trade or commerce among the several states. The fourth section of the act gives the circuit courts of the United States jurisdiction to hear and determine proceedings in equity brought by the district attorneys of the United States under the direction of the attorney general to restrain violations of the act.

Two questions are presented in this case for our decision: First. Was the association of the defendants a contract, combination, or conspiracy in restraint of trade, as the terms are to be understood in the act? Second. Was the trade thus restrained trade between the states?

The contention on behalf of defendants is that the association would have been valid at common law, and that the federal anti-trust law was not intended to reach any agreements that were not void and unenforceable at common law. It might be a sufficient answer to this contention to point to the decision of the supreme court of the United States in U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, in which it was held that contracts in restraint of interstate transportation were within the statute, whether the restraints would be regarded as reasonable at common law or not. It is suggested, however, that that case related to a quasi public employment necessarily under public control, and affecting public interests, and that a less stringent rule of construction applies to contracts restricting parties in sales of merchandise, which is purely a private business, having in it no element of a public or quasi public character. Whether or not there is substance in such a distinction,—a question we do not decide,—it is certain that, if the contract of association which bound the defendants was void and unenforceable at the common law because in restraint of

trade, it is within the inhibition of the statute if the trade it restrained was interstate. Contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal, or giving rise to a civil action for damages in favor of one prejudicially affected thereby, but were simply void, and were not enforced by the courts. Mogul Steamship Co. v. McGregor, Gow & Co., [1892] App. Cas. 25; Hornby v. Close, L. R. 2 Q. B. 153; Lord Campbell, C. J., in Hilton v. Eckersley, 6 El. & Bl. 47, 66; Hannen, J., in Farrer v. Close, L. R. 4 Q. B. 602, 612. The effect of the act of 1890 is to render such contracts unlawful in an affirmative or positive sense, and punishable as a misdemeanor, and to create a right of civil action for damages in favor of those injuried thereby, and a civil remedy by injunction in favor of both private persons and the public against the execution of such contracts and the maintenance of such trade restraints.

The argument for defendants is that their contract of association was not, and could not be, a monopoly, because their aggregate tonnage capacity did not exceed 30 per cent. of the total tonnage capacity of the country; that the restraints upon the members of the association, if restraints they could be called, did not embrace all the states, and were not unlimited in space; that such partial restraints were justified and upheld at common law if reasonable, and only proportioned to the necessary protection of the parties; that in this case the partial restraints were reasonable, because without them each member would be subjected to ruinous competition by the other, and did not exceed in degree of stringency or scope what was necessary to protect the parties in securing prices for their product that were fair and reasonable to themselves and the public; that competition was not stifled by the association because the prices fixed by it had to be fixed with reference to the very active competition of pipe companies which were not members of the association, and which had more than double the defendants' capacity; that in this way the association only modified and restrained the evils of ruinous competition, while the public had all the benefit from competition which public policy demanded.

From early times it was the policy of Englishmen to encourage trade in England, and to discourage those voluntary restraints which tradesmen were often induced to impose on themselves by contract. Courts recognized this public policy by refusing to enforce stipulations of this character. The objections to such restraints were mainly two. One was that by such contracts a man disabled himself from earning a livelihood with the risk of becoming a public charge, and deprived the community of the benefit of his labor. The other was that such restraints tended to give to the covenantee, the beneficiary of such restraints, a monopoly of the trade, from which he had thus excluded one competitor, and by the same means might exclude others.

Chief Justice Parker, in 1711, in the leading case of Mitchel v. Reynolds, 1 P. Wms. 181, 190, stated these objections as follows:

"First. The mischief which may arise from them (1) to the party by the loss of his livelihood and the subsistence of his family; (2) to the public by depriving it of an useful member. Another reason is the great abuses these voluntary restraints are liable to; as, for instance, from corporations who are perpetually laboring for exclusive advantages in trade, and to reduce it into as few hands as possible."

The reasons were stated somewhat more at length in Alger v. Thacher, 19 Pick. 51, 54, in which the supreme judicial court of Massachusetts said:

"The unreasonableness of contracts in restraint of trade and business is very apparent from several obvious considerations: (1) Such contracts injure the parties making them, because they diminish their means of procuring livelihoods and a competency for their families. They tempt improvident persons, for the sake of present gain, to deprive themselves of the power to make future acquisitions; and they expose such persons to imposition and oppression. (2) They tend to deprive the public of the services of men in the employments and capacities in which they may be most useful to the community as well as themselves. (3) They discourage industry and enterprise, and diminish the products of ingenuity and skill. (4) They prevent competition and enhance prices. (5) They expose the public to all the evils of monopoly; and this especially is applicable to wealthy companies and large corporations, who have the means, unless restrained by law, to exclude rivalry, monopolize business, and engross the market. Against evils like these, wise laws protect individuals and the public by declaring all such contracts void."

The changed conditions under which men have ceased to be so entirely dependent for a livelihood on pursuing one trade, have rendered the first and second considerations stated above less important to the community than they were in the seventeenth and eighteenth centuries, but the disposition to use every means to reduce competition and create monopolies has grown so much of late that the fourth and fifth considerations mentioned in Alger v. Thacher have certainly lost nothing in weight in the present day, if we may judge from the statute here under consideration and similar legislation by the states.

The inhibition against restraints of trade at common law seems at first to have had no exception. See language of Justice Hull, Year Book, 2 Hen. V., folio 5, pl. 26. After a time it became apparent to the people and the courts that it was in the interest of trade that certain covenants in restraint of trade should be enforced. It was of importance, as an incentive to industry and honest dealing in trade, that, after a man had built up a business with an extensive good will, he should be able to sell his business and good will to the best advantage, and he could not do so unless he could bind himself by an enforceable contract not to engage in the same business in such a way as to prevent injury to that which he was about to sell. It was equally for the good of the public and trade, when partners dissolved, and one took the business, or they divided the business, that each partner might bind himself not to do anything in trade thereafter which would derogate from his grant of the interest conveyed to his former partner. Again, when two men became partners in a business, although their union might reduce competition, this effect was only an incident to the main purpose of a union of their capital, enterprise, and energy to carry on a successful business, and one useful to the community. Restrictions in the articles of partnership upon the business activity of the members, with a view of securing their entire effort in the common enterprise, were, of course, only ancillary to the main end of the union, and were to be encouraged. Again, when one in business sold property with which the buyer might set up a rival business, it was certainly reasonable that the seller should be able to restrain the buyer from doing him an injury which, but for the sale, the buyer would be unable to inflict.

This was not reducing competition, but was only securing the seller against an increase of competition of his own creating. Such an exception was necessary to promote the free purchase and sale of property. Again, it was of importance that business men and professional men should have every motive to employ the ablest assistants, and to instruct them thoroughly; but they would naturally be reluctant to do so unless such assistants were able to bind themselves not to set up a rival business in the vicinity after learning the details and secrets of the business of their employers.

In a case of this last kind, Mallan v. May, 11 Mees. & W. 652, Baron Parke said:

"Contracts for the partial restraint of trade are upheld, not because they are advantageous to the individual with whom the contract is made, and a sacrifice pro tanto of the rights of the community, but because it is for the benefit of the public at large that they should be enforced. Many of these partial restraints on trade are perfectly consistent with public convenience and the general interest, and have been supported. Such is the case of the disposing of a shop in a particular place, with a contract on the part of the vendor not to carry on a trade in the same place. It is, in effect, the sale of a good will, and offers an encouragement to trade by allowing a party to dispose of all the fruits of his industry. * * * And such is the class of cases of much more frequent occurrence, and to which this present case belongs, of a tradesman, manufacturer, or professional man taking a servant or clerk into his service, with a contract that he will not carry on the same trade or profession within certain limits. * * * In such a case the public derives an advantage in the unrestrained choice which such a stipulation gives to the employer of able assistants, and the security it affords that the master will not withhold from the servant instruction in the secrets of his trade, and the communication of his own skill and experience, from the fear of his afterwards having a rival in the same business."

For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements (1) by the seller of property or business not to compete with the buyer in such a way as to derogate from the value of the property or business sold; (2) by a retiring partner not to compete with the firm; (3) by a partner pending the partnership not to do anything to interfere, by competition or otherwise, with the business of the firm; (4) by the buyer of property not to use the same in competition with the business retained by the seller; and (5) by an assistant, servant, or agent not to compete with his master or employer after the expiration of his time of service. Before such agreements are upheld, however, the court must find that the restraints attempted thereby are reasonably necessary (1, 2, and 3) to the enjoyment by the buyer of the property, good will, or interest in the partnership bought; or (4) to the legitimate ends of the existing partnership; or (5) to the prevention of possible injury to the business of the seller from use by the buyer of the thing sold; or (6) to protection from the danger of loss to the employer's business caused by the unjust use on the part of the employé of the confidential knowledge acquired in such business. Under the first class come the cases of Mitchel v. Reynolds, 1 P. Wms. 181; Fowle v. Parke, 131 U. S. 88, 9 Sup. Ct. 658; Nordenfeldt v. Maxim Nordenfeldt Co., [1894] App. Cas. 534; Rousillon v. Rousillon, 14 Ch. Div. 351; Cloth Co. v. Lorsont, L. R. 9 Eq. 345; Whittaker v. Howe, 3 Beav. 383; Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419; Tode v. Gross, 127 N. Y. 480, 28 N. E. 469; Beal v. Chase,

31 Mich. 490; Hubbard v. Miller, 27 Mich. 15; National Ben. Co. v. Union Hospital Co., 45 Minn. 272, 47 N. W. 806; Whitney v. Slayton, 40 Me. 224; Pierce v. Fuller, 8 Mass. 222; Richards v. Seating Co., 87 Wis. 503, 58 N. W. 787. In the second class are Tallis v. Tallis, 1 El. & Bl. 391, and Lange v. Werk, 2 Ohio St. 520. In the third class are Machinery Co. v. Dolph, 138 U. S. 617, 11 Sup. Ct. 412, Id., 28 Fed. 553, and Matthews v. Associated Press, 136 N. Y. 333, 32 N. E. 981. In the fourth class are American Strawboard Co. v. Haldeman Paper Co., 83 Fed. 619, and Hitchcock v. Anthony, Id. 779, both decisions of this court; Navigation Co. v. Winsor, 20 Wall. 64; Dunlop v. Gregory, 10 N. Y. 241; Hodge v. Sloan, 107 N. Y. 244, 17 N. E. 335. While in the fifth class are the cases of Homer v. Ashford, 3 Bing. 322; Horner v. Graves, 7 Bing. 735; Hitchcock v. Coker, 6 Adol. & E. 454; Ward v. Byrne, 5 Mees & W. 547; Dubowski v. Goldstein, [1896] 1 Q. B. 478; Peels v. Saalfeld, [1892] 2 Ch. 149; Taylor v. Blanchard, 13 Allen, 370; Keeler v. Taylor, 53 Pa. St. 467; Herreshoff v. Boutineau, 17 R. I. 3, 19 Atl. 712.

It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party. In Horner v. Graves, 7 Bing. 735, Chief Justice Tindal, who seems to be regarded as the highest English judicial authority on this branch of the law (see Lord Macnaghten's judgment in Nordenfeldt v. Maxim Nordenfelt Co., [1894] App. Cas. 535, 567), used the following language:

"We do not see how a better test can be applied to the question whether this is or not a reasonable restraint of trade than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party requires can be of no benefit to either. It can only be oppressive. It is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public is void on the ground of public policy."

This very statement of the rule implies that the contract must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary. The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined. In such a case, if the restraint exceeds the necessity presented by the main purpose of the contract, it is void for two reasons: First, because it oppresses the covenantor, without any corresponding benefit to the covenantee; and, second, because it tends to a monopoly. But where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse

the restraint, that it would necessarily have a tendency to monopoly, and therefore would be void. In such a case there is no measure of what is necessary to the protection of either party, except the vague and varying opinion of judges as to how much, on principles of political economy, men ought to be allowed to restrain competition. There is in such contracts no main lawful purpose, to subserve which partial restraint is permitted, and by which its reasonableness is measured, but the sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster.

Much has been said in regard to the relaxing of the original strictness of the common law in declaring contracts in restraint of trade void as conditions of civilization and public policy have changed, and the argument drawn therefrom is that the law now recognizes that competition may be so ruinous as to injure the public, and, therefore, that contracts made with a view to check such ruinous competition and regulate prices, though in restraint of trade, and having no other purpose, will be upheld. We think this conclusion is unwarranted by the authorities when all of them are considered. It is true that certain rules for determining whether a covenant in restraint of trade ancillary to the main purpose of a contract was reasonably adapted and limited to the necessary protection of a party in the carrying out of such purpose have been somewhat modified by modern authorities. In Mitchel v. Reynolds, 1 P. Wms. 181, the leading early case on the subject, in which the main object of the contract was the sale of a bake house, and there was a covenant to protect the purchaser against competition by the seller in the bakery business, Chief Justice Parker laid down the rule that it must appear before such a covenant could be enforced that the restraint was not general, but particular or partial, as to places or persons, and was upon a good and adequate consideration, so as to make it a proper and useful contract. Subsequently, it was decided in Hitchcock v. Coker, 6 Adol. & E. 454, that the adequacy of the consideration was not to be inquired into by the court if it was a legal one, and that the operation of the covenant need not be limited in time. More recently the limitation that the restraint could not be general or unlimited as to space has been modified in some cases by holding that, if the protection necessary to the covenantee reasonably requires a covenant unrestricted as to space, it will be upheld as valid. Whittaker v. Howe, 3 Beav. 383; Cloth Co. v. Lorsont, L. R. 9 Eq. 345; Rousillon v. Rousillon, 14 Ch. Div. 351; Nordenfeldt v. Maxim Nordenfeldt Co., [1894] App. Cas. 535. See, also, Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658; Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419. But these cases all involved contracts in which the covenant in restraint of trade was ancillary to the main and lawful purpose of the contract, and was necessary to the protection of the covenantee in the carrying out of that main purpose. They do not manifest any general disposition on the part of the courts to be more liberal in supporting contracts having for their sole object the restraint of trade than did the courts of an earlier time. It is true that there are some cases in which the courts, mistaking, as we conceive, the proper limits of the relaxation of the rules for determining the unreasonableness of restraints of trade, have

set sail on a sea of doubt, and have assumed the power to say, in respect to contracts which have no other purpose and no other consideration on either side than the mutual restraint of the parties, how much restraint of competition is in the public interest, and how much is not.

The manifest danger in the administration of justice according to so shifting, vague, and indeterminate a standard would seem to be a strong reason against adopting it. The cases assuming such a power in the courts are Wickens v. Evans, 3 Younge & J. 318; Collins v. Locke, 4 App. Cas. 674; Ontario Salt Co. v. Merchants' Salt Co., 18 Grant (U. C.) 540; Kellogg v. Larkin, 3 Pin. 123; Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363.

In Wickens v. Evans, three trunk manufacturers of England, who had competed with each other throughout the realm to their loss, agreed to divide England into three districts, each party to have one district exclusively for his trade, and, if any stranger should invade the district of either as a competitor, they agreed "to meet to devise means to promote their own views." The restraint was held partial and reasonable, because it left the trade open to any third party in either district. In answer to the suggestion that such an agreement to divide up the beer business of London among the London brewers would lead to the abuses of monopoly, it was replied that outside competition would soon cure such abuses,—an answer that would validate the most complete local monopoly of the present day. It may be, as suggested by the court, that local monopolies cannot endure long, because their very existence tempts outside capital into competition; but the public policy embodied in the common law requires the discouragement of monopolies, however temporary their existence may be. The public interest may suffer severely while new competition is slowly developing. The case can hardly be reconciled with later cases, hereafter to be referred to, in England and America. It is true that there was in this case no direct evidence of a desire by the parties to regulate prices, and it has been sometimes explained on the theory that the agreement was solely to reduce the expenses incident to a business covering the realm by restricting its territorial extent; but it is difficult to escape the conclusion that the restraint upon each two of the three parties was imposed to secure to the other a monopoly and power to control prices in the territory assigned to him, because the final clause in the contract implies that, when it was executed, there were no other competitors except the parties in the territory divided.

Collins v. Locke was a case in the privy council. The action was brought to enforce certain articles of agreement by and between four of the leading master stevedore contracting firms in Melbourne, Australia, who did practically all the business at that port. The court (composed of Sir Barnes Peacock, Sir Montague E. Smith, and Sir Robert P. Collier) describes the scope and purposes of the agreement and the view of the court as follows:

"The objects which this agreement has in view are to parcel out the stevedoring business of the port among the parties to it, and so to prevent competition, at least among themselves, and also, it may be, to keep up the price to be paid for the work. Their lordships are not prepared to say that an agreement having these objects is invalid if carried into effect by proper means,—that is, by

provisions reasonably necessary for the purpose,—though the effect of them might be to create a partial restraint upon the power of the parties to exercise their trade."

No attempt is made to justify the view thus comprehensively stated, or to support it by authority, or to reconcile it with the general doctrine of the common law that contracts restraining competition, raising prices, and tending to a monopoly, as this is conceded by the court to have been, are void. The court ignores the public interest that prices shall be regulated by competition, and assumes the power in the court to uphold and enforce a contract securing a monopoly if it affect only one port, so as to be but a partial restraint of trade. The case is directly at variance with the decision of the supreme court of Illinois in More v. Bennett, 140 Ill. 69, 29 N. E. 888, hereafter discussed, and cannot be reconciled in principle with many of the other cases cited.

The Canadian case of Ontario Salt Co. v. Merchants' Salt Co. is another one upon which counsel for the defendants rely. That was the decision of a vice chancellor. Six salt companies, in order to maintain prices, combined, and put their business under the control of a committee, and agreed not to sell except through the committee. It was held that because it appeared that there were other salt companies in the province, and because the combiners denied that they intended to raise prices, but only to maintain them, the contract of union was not in unlawful restraint of trade. The conclusion and argument of the court in Salt Co. v. Guthrie, 35 Ohio St. 666, hereafter stated, would seem to be a sufficient answer to this case.

Kellogg v. Larkin, 3 Pin. 123, was an early case in Wisconsin, in which the action was on the covenant of a warehouseman in a lease of his warehouse, by which he agreed to devote his services to the lessee at certain compensation, and not to purchase or store wheat in the Milwaukee market. The covenant was held valid. Had nothing else appeared in the case, the conclusion would have been clearly right, because such a covenant might well have been reasonably necessary to the protection of the lessee in his enjoyment of the warehouse and the good will of the lessor. But it further appeared that this lease, with the covenant, was only one of many such executed by the warehousemen of Milwaukee to the united grain dealers of that city, to enable the latter to obtain absolute control of the wheat market in Milwaukee. The court held the latter combination valid also. The decision cannot be upheld, in view of the more modern authorities hereafter referred to.

The case of Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363, would seem to be an authority against our view. In that case a stockholder sought to restrain the payment of an annual payment about to be made by the Old Dominion Steamship Company under a contract by which it bought off the Lorillard Steamship Company from continuing in competition with it in carrying passengers and freight between New York and Norfolk. The contract was held valid, although it had no purpose except the restraining of competition, and, so far as appears, the obtaining of the complete control of the business. The case is rested on Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, which was a case of the purchase of property and good will. It proceeds on the

general proposition "that competition is not invariably a public bene-
faction; for it may be carried on to such a degree as to become a gen-
eral evil," and thus leaves it to the discretion of the court to say how
much competition is desirable, and how much is mischievous, and ac-
cordingly to determine whether a contract is bad or not.   The case is
directly opposed to Anderson v. Jett, 89 Ky. 375, 12 S. W. 670, here-
after cited.   It should be said that nothing appears in the report of the
case to show directly that the purpose of the contract was to reserve the
entire business to the Dominion Company, or to secure to it the power
of regulating prices, but this natural inference from the terms of the
contract is not negatived.

The case of Mogul Steamship Co. v. McGregor, Gow & Co., [1892]
App. Cas. 25, has been cited to sustain the position of the defendants.
It does not do so.   It was a suit for damages, brought by a com-
pany engaged in the tea-carrying trade at Hankow, China, against six
other companies engaged in the same trade, for loss inflicted by an
alleged unlawful conspiracy entered into by them to drive the plain-
tiff out of the trade, and to obtain control of the trade themselves.   It
appeared that the defendants agreed to conform to a plan of asso-
ciation, by which they should constantly underbid the plaintiff, and
take away his trade by offering exceptional and very favorable terms
to customers dealing exclusively with the members of the association,
and that they did this to control the business the next season after
he had been thus driven out of competition.   It was held by the house
of lords that this was not an unlawful and indictable conspiracy, giv-
ing rise to a cause of action by the person injured thereby; but it
was not held that the contract of association entered into by the de-
fendants was not void and unenforceable at common law.   On the
contrary, Lord Bramwell, in his judgment (at page 46), and Lord Han-
nen, in his (at page 58), distinctly say that the contract of association
was void as in restraint of trade; but all the law lords were of opinion
that contracts void as in restraint of trade were not unlawful in a
criminal sense, and gave no right of action for damages to one in-
jured thereby.   The statute we are considering expressly gives such
contracts a criminal and unlawful character.   It is manifest, there-
fore, that whatever of relevancy the Mogul Steamship Co. Case has in
this discussion makes for, rather than against, our conclusion.

Two other cases deserve mention here.   They are Roller Co. v.
Cushman, 143 Mass. 353, 9 N. E. 629, and Gloucester Isinglass &
Glue Co. v. Russia Cement Co., 154 Mass. 92, 27 N. E. 1005.   In
these cases it was held that contracts in restraint of trade are not in-
valid if they affect trade in articles which, though useful and con-
venient, are not articles of prime or public necessity, and therefore
contracts between dealers made to secure complete control of the
manufacture and sale of such articles were supported.   In the first
case the article involved was a fastening of a certain shade roller,
and in the other was glue made from fish skins.   We think the
cases hereafter cited show that the common law rule against re-
straint of trade extends to all articles of merchandise, and that the
introduction of such a distinction only furnishes another opportunity
for courts to give effect to the varying economical opinions of its in-

dividual members.    It might be difficult to say why it was any more important to prevent restraints of trade in beer, mineral water, leather cloth, and wire cloth than of trade in curtain shades or glue. However this may be, the cases do not touch the case at bar, because the same court, in Telegraph Co. v. Crane, 160 Mass. 50, 35 N. E. 98, held that fire-alarm telegraph instruments were articles of sufficient public necessity to render unreasonable restraints of trade in them void, and certainly such articles are not more necessary for public use than water, gas, and sewer pipe.

There are other cases upon which counsel of defendants rely, which, in our judgment, have no bearing on the issue, or, if they have, are clearly within the rules we have already stated.    One is a case in which a railroad company made a contract with a sleeping-car company by which the latter agreed to do the sleeping-car business of the railway company on a number of conditions, one of which was that no other company should be allowed to engage in the sleeping-car business on the same line.    Chicago, St. L. & N. O. R. Co. v. Pullman Southern Car Co., 139 U. S. 79, 11 Sup. Ct. 490.    The main purpose of such a contract is to furnish sleeping-car facilities to the public.    The railroad company may discharge this duty itself to the public, and allow no one else to do it, or it may hire some one to do it, and, to secure the necessary investment of capital in the discharge of the duty, may secure to the sleeping-car company the same freedom from competition that it would have itself in discharging the duty.    The restraint upon itself is properly proportioned to, and is only ancillary to, the main purpose of the contract, which is to secure proper facilities to the public.    Exactly the same principle applies to similarly exclusive contracts with express companies, and stock-yard delivery companies.    Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628; Stock-Yards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 461; Butchers' & Drovers' Stock-Yards Co. v. Louisville & N. R. Co., 31 U. S. App. 252, 14 C. C. A. 290, and 67 Fed. 35.    The fact is that it is quite difficult to conceive how competition would be possible upon the same line of railway between sleeping-car companies or express companies.    Such contracts involve the hauling of sleeping cars or express cars on each express train, the assignment of offices in each station, and various running arrangements, which it would be an intolerable burden upon the railroad company to make and execute for two companies at the same time.    And the same is true of contracts with a stock delivery company.    The railway company could not ordinarily be expected to have more than one general station for the delivery of cattle in any one town.    It would only be required by the nature of its employment to furnish such facilities as were reasonably sufficient for the business at that place.    There is hardly more objection on the ground of public policy to such a restriction upon a railway company in cases like these than there would be to a restriction upon a lessor not to allow the subject-matter of the lease to be enjoyed by any one but the lessee during the lease.    The privilege, when granted, is hardly capable of other than exclusive enjoyment.    The public interest is satisfactorily secured by the requirement, which may be enforced by any member of the public, to

wit, that the charges allowed shall not be unreasonable, and the business is of such a public character that it is entirely subject to legislative regulation in the same interest.

Having considered the cases upon which the counsel for the defendants have relied to maintain the proposition that contracts having no purpose but to restrain competition and maintain prices, if reasonable, will be held valid, we must now pass in rapid review the cases that make for an opposite view.

In People v. Sheldon, 139 N. Y. 251, 34 N. E. 785, all the coal dealers in the city of Lockport, N. Y., entered into a contract of association, forming a coal exchange to prevent competition by constituting the exchange the sole authority to fix the price to be charged by members for coal sold by them, and the price was thus fixed. The court approved a charge to the jury that even if this was merely a combination between independent coal dealers to prevent competition between themselves for the due protection of the parties to it against ruinous rivalry, and although no attempt was made to charge unreasonable or excessive prices, it was inimical to trade and commerce, whatever might be done under it, and was within the state statute making a conspiracy injurious to trade indictable. Said Andrews, C. J. (page 264, 139 N. Y., and page 789, 34 N. E.):

"If agreements and combinations to prevent competition in prices are or may be hurtful to trade, the only sure remedy is to prohibit all agreements of that character. If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be very difficult in any case to establish the invalidity, although the moral evidence might be very convincing."

See, to the same effect, Judd v. Harrington, 139 N. Y. 105, 34 N. E. 790; Leonard v. Poole, 114 N. Y. 371, 21 N. E. 707; De Witt Wire-Cloth Co. v. New Jersey Wire-Cloth Co. (Com. Pl.) 14 N. Y. Supp. 277.

In Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173, five coal companies controlling the bituminous coal trade in Northern Pennsylvania agreed to allow a committee to fix prices and rates of freight, and to fix proportion of sales by each. Competition was not destroyed, because the anthracite coal and Cumberland bituminous coal were sold in competition with this coal. The association was, nevertheless, held void, as in illegal restraint of trade and competition, and tending to injure the public. In Nester v. Brewing Co., 161 Pa. St. 473, 29 Atl. 102, 45 brewers in Philadelphia made an agreement to sell beer in Philadelphia and Camden at a certain price to be fixed by a committee of their number. Though beer could hardly be said to be an article of prime necessity like coal, yet, as it was an article of merchandise, the contract was held void, as in restraint of trade, and tending to a monopoly.

In Salt Co. v. Guthrie, 35 Ohio St. 666, the salt manufacturers of a salt producing territory in Ohio, with some exceptions, combined to regulate the price of salt by preventing ruinous competition between themselves, and agreed to sell only at prices fixed by a committee of their number. The supreme court of Ohio held the contract void. Judge McIlvaine, who delivered the opinion of the court, said:

"The clear tendency of such an agreement is to establish a monopoly, and to destroy competition in trade, and for that reason, on the ground of public policy, courts will not aid in its enforcement. It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public. It is enough to know that the inevitable tendency of such contracts is injurious to the public."

Other Ohio cases which presented similar facts, and in which the same rule was enforced, are Emery v. Candle Co., 47 Ohio St. 320, 24 N. E. 660, and Hoffman v. Brooks, 11 Wkly. Law Bul. 258.

In Anderson v. Jett, 89 Ky. 375, 12 S. W. 670, two owners of steamboats running on the Kentucky river made an agreement to keep up rates, and divide net profits, to prevent ruinous competition and reduced rates. The contract was held void.

In Chapin v. Brown, 83 Iowa, 156, 48 N. W. 1074, the grocerymen in a town, in order to avoid a trade in butter which was burdensome, agreed not to buy any butter or to take it in trade except for use in their own families, so as to throw the business into the hands of one man who dealt in butter exclusively. The agreement was held invalid, because in restraint of trade, and tending to create a monopoly.

In Craft v. McConoughy, 79 Ill. 346, five grain dealers in Rochelle, Ill., agreed to conduct their business as if independent of each other, but secretly to fix prices at which they would sell grain, and to divide profits in a certain proportion. This was held void, as in restraint of trade, and tending to create a monopoly. In More v. Bennett, 140 Ill. 69, 29 N. E. 888, articles of association entered into by only a part of the stenographers of Chicago to fix a schedule of prices, and prevent competition among their members and a consequent reduction of prices, was held void. The court said:

"A combination among a number of persons engaged in a particular business to stifle or prevent competition, and thereby to enhance or diminish prices to a point above or below what they would be if left to the influence of unrestricted competition, is contrary to public policy. Contracts in partial restraint of trade which the law sustains are those entered into by a vendor of a business and its good will with its vendee, by which the vendor agrees not to engage in the same business within a limited territory; and the restraint, to be valid, must be no more extensive than is reasonably necessary for the protection of the vendee in the enjoyment of the business purchased."

As already said, this case is in direct conflict with Collins v. Locke, 4 App. Cas. 674, discussed above. To the same effect as More v. Bennett are Ford v. Association, 155 Ill. 166, 39 N. E. 651, and Bishop v. Preservers Co., 157 Ill. 284, 41 N. E. 765.

In Association v. Niezerowski, 95 Wis. 129, 70 N. W. 166, the suit was on a note given in pursuance of the secret rules of an association of 60 out of the 75 master masons in Milwaukee, by which all bids for work about to be let were first made to the association, and the lowest bidder was then required to add 6 per cent. to his bid, and, if the bid was more than 8 per cent. below the next lowest bidder, more than 6 per cent. might be added. Each member was required to pay to the association 6 per cent. of his estimates when due, for subsequent distribution. In declaring the contract void, the court said:

85 F.—19

"The combination in question is contrary to public policy, and strikes at the interests of those of the public desiring to build, and between whom and the association or the members thereof there exist no contract relations."

In Vulcan Powder Co. v. Hercules Powder Co., 96 Cal. 510, 31 Pac. 581, four powder companies of California agreed that each should sell at a price to be fixed by a committee of their representatives, and should pay over to the others the profits on any excess of sales over a fixed proportion of the total sales. The contract was held void.

In Oil Co. v. Adoue, 83 Tex. 650, 19 S. W. 274, five owners of cotton-seed oil mills in Texas made an agreement not to sell at less than certain agreed prices. One guarantied profits to the four others, and suit was brought on the guaranty. It was held void, as restraining trade, and tending to a monopoly, even though the evidence failed to establish that it effected a monopoly.

In Association v. Kock, 14 La. Ann. 168, eight commercial firms in New Orleans holding a large quantity of cotton bagging entered into an agreement by which they stipulated that for three months no member should sell a bale except by a vote of the majority. It was held that the contract was "palpably and unequivocally a combination in restraint of trade, and to enhance the price in the market of an article of primary necessity to cotton planters. Such combinations are contrary to public order, and cannot be enforced in a court of justice."

In Hilton v. Eckersley, 6 El. & Bl. 47, it was held that an agreement between 18 cotton manufacturers to submit to the control of a committee of their number for 12 months the question as to prices to be paid for labor and the terms of employment, in order to resist the aggressions of an association of workingmen, was void and unenforceable, because in restraint of trade.

In Urmston v. Whitelegg, 63 L. T. (N. S.) 455, a case in the queen's bench division, before Day and Lawrence, JJ., the action was brought to enforce a penalty under the rules of the Bolton Mineral Water Manufacturers' Association, which recited that the object of the association was to maintain the price of mineral water, and bound the members for 10 years not to sell at less than 9d. a dozen bottles, or at not less than any higher price fixed by the committee, on penalty of £10 for each violation. Day, J., said:

"If a contract for raising prices against the public interest is a contract in restraint of trade, this is undoubtedly such a contract. During the last hundred years great changes have taken place in the views of the public, of the legislature, and therefore of the judges, on the matter, and many old-fashioned offenses have disappeared; but the rule still obtains that combination for the mere purpose of raising prices is not enforceable in a court of law. This contract is illegal in the sense of not being enforceable. It is not necessary that it should be such as to form the ground of criminal proceedings."

In the foregoing cases the only consideration of the agreement restraining the trade of one party was the agreement of the other to the same effect, and there was no relation of partnership, or of vendor and vendee, or of employer and employé. Where such relation exists between the parties, as already stated, restraints are usually enforceable if commensurate only with the reasonable pro-

tection of the covenantee in respect to the main transactions affected by the contract. But, in recent years, even the fact that the contract is one for the sale of property or of business and good will, or for the making of a partnership or a corporation, has not saved it from invalidity if it could be shown that it was only part of a plan to acquire all the property used in a business by one management with a view to establishing a monopoly. Such cases go a step further than those already considered. In them the actual intent to monopolize must appear. It is not deemed enough that the mere tendency of the provisions of the contract should be to restrain competition. In such cases the restraint of competition ceases to be ancillary, and becomes the main purpose of the contract, and the transfer of property and good will, or the partnership agreement, is merely ancillary and subordinate to that purpose. The principal cases of this class are Richardson v. Buhl, 77 Mich. 632, 43 N. W. 1102; Arnot v. Coal Co., 68 N. Y. 558; People v. Milk Exchange, 145 N. Y. 267, 39 N. E. 1062; People v. Refining Co., 54 Hun, 366, 7 N. Y. Supp. 406; State v. Nebraska Distilling Co., 29 Neb. 700, 46 N. W. 155; State v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279; Manufacturing Co. v. Klotz, 44 Fed. 721; Distilling & Cattle Feeding Co. v. People, 156 Ill. 448, 41 N. E. 188; Carbon Co. v. McMillin, 119 N. Y. 46, 23 N. E. 530; Harrow Co. v. Hench, 83 Fed. 36; Factor Co. v. Adler, 90 Cal. 110, 27 Pac. 36; Lumber Co. v. Hayes, 76 Cal. 387, 18 Pac. 391.

In addition to the cases cited, there are others which sustain the general principle, but in them there exists the additional reason for holding the contracts invalid that the parties were engaged in a quasi public employment. They are Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. 553; People v. Chicago Gas Trust Co., 130 Ill. 268, 22 N. E. 798; Stockton v. Railroad Co., 50 N. J. Eq. 52, 24 Atl. 964; West Va. Transp. Co. v. Ohio River Pipe-Line Co., 22 W. Va. 600; Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Denio, 434; Railroad Co. v. Collins, 40 Ga. 582; Hazlehurst v. Railroad Co., 43 Ga. 13.

Upon this review of the law and the authorities, we can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from committing financial suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly. But the facts of the case do not require us, to go so far as this, for they show that the attempted justification of this association on the grounds stated is without foundation.

The defendants, being manufacturers and vendors of cast-iron pipe, entered into a combination to raise the prices for pipe for all the states west and south of New York, Pennsylvania, and Virginia, constituting considerably more than three-quarters of the territory of the United States, and significantly called by the associates "pay territory." Their joint annual output was 220,000 tons. The total capacity of all the other cast-iron pipe manufacturers in the pay territory was 170,500 tons. Of this, 45,000 tons was the ca-

pacity of mills in Texas, Colorado, and Oregon, so far removed from that part of the pay territory where the demand was considerable that necessary freight rates excluded them from the possibility of competing, and 12,000 tons was the possible annual capacity of a mill at St. Louis, which was practically under the same management as that of one of the defendants' mills. Of the remainder of the mills in pay territory and outside of the combination, one was at Columbus, Ohio, two in northern Ohio, and one in Michigan. Their aggregate possible annual capacity was about one-half the usual annual output of the defendants' mills. They were, it will be observed, at the extreme northern end of the pay territory, while the defendants' mills at Cincinnati, Louisville, Chattanooga, and South Pittsburg, and Anniston, and Bessemer, were grouped much nearer to the center of the pay territory. The freight upon cast-iron pipe amounts to a considerable percentage of the price at which manufacturers can deliver it at any great distance from the place of manufacture. Within the margin of the freight per ton which Eastern manufacturers would have to pay to deliver pipe in pay territory, the defendants, by controlling two-thirds of the output in pay territory, were practically able to fix prices. The competition of the Ohio and Michigan mills, of course, somewhat affected their power in this respect in the northern part of the pay territory; but, the further south the place of delivery was to be, the more complete the monopoly over the trade which the defendants were able to exercise, within the limit already described. Much evidence is adduced upon affidavit to prove that defendants had no power arbitrarily to fix prices, and that they were always obliged to meet competition. To the extent that they could not impose prices on the public in excess of the cost price of pipe with freight from the Atlantic seaboard added, this is true; but, within that limit, they could fix prices as they chose. The most cogent evidence that they had this power is the fact, everywhere apparent in the record, that they exercised it. The details of the way in which it was maintained are somewhat obscured by the manner in which the proof was adduced in the court below, upon affidavits solely, and without the clarifying effect of cross-examination, but quite enough appears to leave no doubt of the ultimate fact. The defendants were, by their combination, therefore able to deprive the public in a large territory of the advantages otherwise accruing to them from the proximity of defendants' pipe factories, and, by keeping prices just low enough to prevent competition by Eastern manufacturers, to compel the public to pay an increase over what the price would have been, if fixed by competition between defendants, nearly equal to the advantage in freight rates enjoyed by defendants over Eastern competitors. The defendants acquired this power by voluntarily agreeing to sell only at prices fixed by their committee, and by allowing the highest bidder at the secret "auction pool" to become the lowest bidder of them at the public letting. Now, the restraint thus imposed on themselves was only partial. It did not cover the United States. There was not a complete monopoly. It was tempered by the fear of competition, and it affected only a part of the price. But this certainly does not

take the contract of association out of the annulling effect of the rule against monopolies.     In U. S. v. E. C. Knight Co., 156 U. S. 1, 16, 15 Sup. Ct. 255, Chief Justice Fuller, in speaking for the court, said:

"Again, all the authorities agree that, in order to vitiate a contract or combination, it is not essential that its result should be a complete monopoly. It is sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition."

It has been earnestly pressed upon us that the prices at which the cast-iron pipe was sold in pay territory were reasonable.     A great many affidavits of purchasers of pipe in pay territory, all drawn by the same hand or from the same model, are produced, in which the affiants say that, in their opinion, the prices at which pipe has been sold by defendants have been reasonable.     We do not think the issue an important one, because, as already stated, we do not think that at common law there is any question of reasonableness open to the courts with reference to such a contract.     Its tendency was certainly to give defendants the power to charge unreasonable prices, had they chosen to do so.     But, if it were important, we should unhesitatingly find that the prices charged in the instances which were in evidence were unreasonable.     The letters from the manager of the Chattanooga foundry written to the other defendants, and discussing the prices fixed by the association, do not leave the slightest doubt upon this point, and outweigh the perfunctory affidavits produced by the defendants.     The cost of producing pipe at Chattanooga, together with a reasonable profit, did not exceed $15 a ton. It could have been delivered at Atlanta at $17 to $18 a ton, and yet the lowest price which that foundry was permitted by the rules of the association to bid was $24.25.     The same thing was true all through pay territory to a greater or less degree, and especially at "reserved cities."

Another aspect of this contract of association brings it within the term used in the statute, "a conspiracy in restraint of trade."     A conspiracy is a combination of two or more persons to accomplish an unlawful end by lawful means or a lawful end by unlawful means. In the answer of the defendants, it is averred that the chief way in which cast-iron pipe is sold is by contracts let after competitive bidding invited by the intending purchaser.     It would have much interfered with the smooth working of defendants' association had its existence and purposes become known to the public.     A part of the plan was a deliberate attempt to create in the minds of the members of the public inviting bids the belief that competition existed between the defendants.     Several of the defendants were required to bid at every letting, and to make their bids at such prices that the one already selected to obtain the contract should have the lowest bid. It is well settled that an agreement between intending bidders at a public auction or a public letting not to bid against each other, and thus to prevent competition, is a fraud upon the intending vendor or contractor, and the ensuing sale or contract will be set aside.     Breslin v. Brown, 24 Ohio St. 565; Atcheson v. Mallon, 43 N. Y. 147; Loyd v. Malone, 23 Ill. 41; Wooton v. Hinkle, 20 Mo. 290; Phippen v. Stickney, 3 Metc. (Mass.) 384; Kearney v. Taylor, 15 How. 494,

519; Wilbur v. How, 8 Johns. 444; Hannah v. Fife, 27 Mich. 172; Gibbs v. Smith, 115 Mass. 592; Swan v. Chorpenning, 20 Cal. 182; Gardiner v. Morse, 25 Me. 140; Ingram v. Ingram, 49 N. C. 188; Brisbane v. Adams, 3 N. Y. 129; Woodruff v. Berry, 40 Ark. 251; Wald, Pol. Cont. 310, note by Mr. Wald, and cases cited. The case of Jones v. North, L. R. 19 Eq. 426, to the contrary, cannot be supported. The largest purchasers of pipe are municipal corporations, and they are by law required to solicit bids for the sale of pipe in order that the public may get the benefit of competition. One of the means adopted by the defendants in their plan of combination was this illegal and fraudulent effort to evade such laws, and to deceive intending purchasers. No matter what the excuse for the combination by defendants in restraint of trade, the illegality of the means stamps it as a conspiracy, and so brings it within that term of the federal statute.

The second question is whether the trade restrained by the combination of the defendants was interstate trade. The mills of the defendants were situated, two in Alabama, two in Tennessee, one in Kentucky, and one in Ohio. The invariable custom in sales of pipe required the seller to deliver the pipe at the place where it was to be used by the buyer, and to include in the price the cost of delivery. The contracts, as the answer of the defendants avers, were invariably made after public letting at the home, and in the state, of the buyer. The pay territory, sales in which it was the professed object of the defendants to regulate by their contract of association, included 36 states. The cities which were especially reserved for the benefit of the defendants were Atlanta and Anniston, reserved to the Anniston mill, in Alabama; New Orleans and Chattanooga, reserved to the Chattanooga mill, in Tennessee; St. Louis and Birmingham, reserved to the Bessemer mill, in Alabama; Omaha, reserved to the South Pittsburg mill, in Tennessee; Louisville, New Albany, and Jeffersonville, reserved to Dennis Long & Co., of Louisville; and Cincinnati, Newport, and Covington, reserved to the Addyston mill, in Ohio. Under the agreement, every request for bids from any place, except the reserved cities, sent to any one of the defendants, was submitted to the central committee, who fixed a price, and the contract was awarded to that member who would agree to pay for the benefit of the other members of the association the largest "bonus." In the case of the reserved cities, the successful bidder having been already fixed, the association determined the price and bonus to be paid. The contract of association restrained every defendant except the one selected to receive the contract from soliciting (in good faith) or making a contract for pipe with the intending purchaser at all, and restrained the defendant so selected from making the contract except at the price fixed by the committee. In cases of pipe to be purchased in any state of the 36 in pay territory, except 4, each one of the defendants, by his contract of association, restrained his freedom of trade in respect to making a contract in that state for the sale of pipe to be delivered across state lines; five of them agreeing not to make such a contract at all, and the sixth agreeing not to make the contract below a fixed price. With respect to sales in Ohio, Kentucky,

Tennessee, and Alabama, the effect of the contract of association was to bind at least three, sometimes four, and sometimes five, of the defendants not to make a contract at all in those states for the sale and delivery of pipe from another state; and if the job were assigned, as it might be, to one living in a different state from the place of the contract and delivery, its effect would be to bind him not to sell and deliver pipe across state lines at less than a certain price. It thus appears that no sale or proposed sale can be suggested within the scope of the contract of association with respect to which that contract did not restrain at least three, often four, more often five, and usually all, of the defendants in the exercise of the freedom, which but for the contract would have been theirs, of selling in one state pipe to be delivered from another state at any price they might see fit to fix. Can there be any doubt that this was a restraint of interstate trade and commerce? Mr. Justice Field, in County of Mobile v. Kimball, 102 U. S. 691, 696, said:

"Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities."

In Robbins v. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. 592, a law of Tennessee, which imposed a tax on all "drummers" who solicited orders on samples, was held unconstitutional in so far as it applied to the drummer of an Ohio firm, who was soliciting orders for goods to be sent from Ohio to purchasers in Tennessee, on the ground that it was a tax on interstate commerce. In delivering the opinion of the court in that case, Mr. Justice Bradley said (page 497, 120 U. S., and page 596, 7 Sup. Ct.) that a tax on the sale of goods, or the offer to sell them before they are brought into the state, was clearly a tax on interstate commerce. He further said:

"The negotiation of sales of goods which are in another state, for the purpose of introducing them into the state in which the negotiation is made, is interstate commerce."

The principle thus announced has been reaffirmed by the court in Corson v. Maryland, 120 U. S. 502, 7 Sup. Ct. 655; in Asher v. Texas, 128 U. S. 129, 9 Sup. Ct. 1; in Stoutenburgh v. Hennick, 129 U. S. 141, 9 Sup. Ct. 256; and in Brennan v. City of Titusville, 153 U. S. 289, 14 Sup. Ct. 829. The point of these cases was emphasized by the distinction taken in Emert v. Missouri, 156 U. S. 296, 15 Sup. Ct. 367, in which the validity of a law of Missouri, imposing a tax on peddlers, was in question. The plaintiff in error, convicted under the law of failure to pay the tax, was the selling agent of a New Jersey sewing machine manufacturing company, who carried the machine for sale with him in his wagon. It was held that in such a case, the machine having become part of the mass of property in the state, the tax on the peddler was not a tax on interstate commerce.

If, then, the soliciting of orders for, and the sale of, goods in one state, to be delivered from another state, is interstate commerce in in its strictest and highest sense,—such that the states are excluded by the federal constitution from a right to regulate or tax the same,—it seems clear that contracts in restraint of such solicita-

tions, negotiations, and sales are contracts in restraint of interstate commerce. The anti-trust law is an effort by congress to regulate interstate commerce. Such commerce as the states are excluded from burdening or regulating in any way by tax or otherwise, because of the power of congress to regulate interstate commerce, must, of necessity, be the commerce which congress may regulate, and which, by the terms of the anti-trust law, it has regulated. We can see no escape from the conclusion, therefore, that the contract of the defendants was in restraint of interstate commerce.

The learned judge who dismissed the bill at the circuit was of opinion that the contract of association only indirectly affected interstate commerce, and relied chiefly for this conclusion on the decision of the supreme court in the case of U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249. In that case the bill filed under the anti-trust law sought to enjoin the defendants from continuing a union of substantially all the sugar refineries of the country for the refining of raw sugars. The supreme court held that the monopoly thus effected was not within the law, because the contract or agreement of union related only to the manufacture of refined sugar, and not to its sale throughout the country; that manufacture preceded commerce, and although the manufacture under a monopoly might, and doubtless would, indirectly affect both internal and interstate commerce, it was not within the power of congress to regulate manufactures within a state on that ground. The case arose on a bill in equity filed by the United States under the anti-trust act, praying for relief in respect of certain agreements under which the American Sugar-Refining Company had purchased the stock of four Philadelphia sugar-refining companies with shares of its own stock, whereby the American Company acquired nearly complete control of the manufacture of refined sugar in this country. The relief sought was the cancellation of the agreements of purchase, the redelivery of the stock to the parties respectively, and an injunction against the further performance of the agreements and further violations of the act. The chief justice, in delivering the judgment of the court, said:

"The argument is that the power to control the manufacture of refined sugar is a monopoly over a necessity of life, to the enjoyment of which by a large part of the population of the United States interstate commerce is indispensable, and that, therefore, the general government, in the exercise of the power to regulate commerce, may repress such monopoly directly, and set aside the instruments which have created it. * * * Doubtless the power to control the manufacture of a given thing involves in a certain sense the control of its disposition, but this is a secondary, and not the primary, sense; and, although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and it affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it. The power to regulate commerce is the power to prescribe the rule by which commerce shall be governed, and is a power independent of the power to suppress monopoly. But it may operate in repression of monopoly whenever that comes within the rules by which commerce is governed, or whenever the transaction is itself a monopoly of commerce. * * * The regulation of commerce applies to the subjects of commerce, and not to matters of internal police. Contracts to buy, sell, or exchange goods to be transported among the several states, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purpose of such transit among the states, or put in the way of transit, may be regulated; but this is because they form part of interstate trade or commerce. The fact

that an article is manufactured for export to another state does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the state, and belongs to commerce."

The chief justice then refers to the prior case of Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, in which it was held that logs were not made subjects of interstate commerce by the mere intent of the owner to ship them into another state, so that state taxation upon them could be regarded as a burden upon interstate commerce, until that intent had been carried so far into execution that "they had commenced their final movement from the state of their origin to that of their destination." Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, is also referred to. In that case it was held that a law of Iowa, which forbade the manufacture of spirituous liquor except for certain purposes, was not in conflict with the commerce clause of the federal constitution, although it appeared by proof that the liquor was to be manufactured only with intent to ship the same out of the state. The chief justice further said:

"It was in the light of well-settled principles that the act of July 2, 1890, was framed. Congress did not attempt thereby to assert the power to deal with monopoly directly as such: or to limit and restrict the rights of corporations created by the states or the citizens of the states in the acquisition, control, or disposition of property; or to regulate or prescribe the price or prices at which such property or the products thereof should be sold; or to make criminal the acts of persons in the acquisition and control of property which the states of their residence or creation sanctioned or permitted. Aside from the provisions applicable where congress might exercise municipal power, what the law struck at was combinations, contracts, and conspiracies to monopolize trade and commerce among the several states or with foreign nations; but the contracts and acts of the defendants related exclusively to the acquisition of the Philadelphia refineries and the business of sugar refining in Pennsylvania, and bore no direct relation to commerce between the states or with foreign nations. The object was manifestly private gain in the manufacture of the commodity, but not through the control of interstate or foreign commerce. * * * There was nothing in the proofs to indicate any intention to put a restraint upon trade or commerce, and the fact, as we have seen, that trade or commerce might be indirectly affected, was not enough to entitle complainants to a decree."

We have thus considered and quoted from the decision in the Knight Case at length, because it was made the principal ground for the action of the court below, and is made the chief basis of the argument on behalf of the defendants here. It seems to us clear that, from the beginning to the end of the opinion, the chief justice draws the distinction between a restraint upon the business of manufacturing and a restraint upon the trade or commerce between the states in the articles after manufacture, with the manifest purpose of showing that the regulating power of congress under the constitution could affect only the latter, while the former was not under federal control, and rested wholly with the states. Among the subjects of commercial regulation by congress, he expressly mentions "contracts to buy, sell, or exchange goods to be transported among the several states," and leaves it to be plainly inferred that the statute does embrace combinations and conspiracies which have for their object to restrain, and which necessarily operate in restraint of, the freedom of such contracts. The citation of the case of Coe v.

Errol was apt to show that merchandise, before its shipment across state lines, was not within the regulating power of congress, and, a fortiori, that its manufacture was not; while Kidd v. Pearson clearly made the distinction between the absence of power in congress to control manufacturing merely because the manufacturer intends to add to interstate commerce with the product, and the power which congress has to prevent obstructions to interstate transportation in the product when made. But neither of these cases controls the one now under consideration. The subject-matter of the restraint here was not articles of merchandise or their manufacture, but contracts for sale of such articles to be delivered across state lines, and the negotiations and bids preliminary to the making of such contracts, all of which, as we have seen, do not merely affect interstate commerce, but are interstate commerce. It can hardly be said that a combination in restraint of what is interstate commerce does not directly affect and burden that commerce. The error into which the circuit court fell, it seems to us, was in not observing the difference between the regulating power of congress over contracts and negotiations for sales of goods to be delivered across state lines, and that over the merchandise, the subject of such sales and negotiations. The goods are not within the control of congress until they are in actual transit from one state to another. But the negotiations and making of sales which necessarily involve in their execution the delivery of merchandise across state lines are interstate commerce, and so within the regulating power of congress even before the transit of the goods in performance of the contract has begun.

The language of the chief justice in the last passages quoted above from his opinion, upon which so much reliance was placed by the circuit court and the defendants' counsel at the bar, is to be interpreted by the facts of the case before the court. The statement in the opinion that congress did not intend by the anti-trust act to limit and restrict the rights of persons and corporations in the mere acquisition, control, or disposition of property, or to regulate the prices at which such property should be sold, or to make criminal the acts of persons or corporations in the acquisition and control of property which the states of their residence or creation sanctioned or permitted, does not imply that congress did not intend to strike down any combination which had for its object the restraint and attempted monopoly of trade and commerce among a given number of states in specified articles of commerce, and the resulting power to regulate prices therein. The obstacle in the way of granting the relief asked in U. S. v. E. C. Knight Co. was (to use the language of the chief justice) that "the contracts and acts of the defendant related exclusively to the acquisition of the Philadelphia refineries, and the business of sugar refining in Pennsylvania, and bore no direct relation to commerce between the states or with foreign nations." The supreme court distinctly adjudged that "what the law struck at was combinations, contracts, and conspiracies to monopolize trade and commerce among the several states or with foreign nations." That the defendants in the present case combined and contracted with each other for the purpose of restraining trade

and commerce among the states covered by their agreement, in the articles manufactured by them, is too clear to admit of dispute. In the E. C. Knight Co. Case there was, the supreme court said, "nothing in the proofs to indicate any intention to put a restraint upon trade or commerce." In the present case the proofs show that no one of the companies in this pipe-trust combination was allowed to send its goods out of the state in which they were manufactured except upon the terms established by the agreement. Can it be doubted that this was a direct restraint upon interstate commerce in those goods? To give the language of the opinion in the Knight Case the construction contended for by defendants would be to assume that the court, after having in the clearest way distinguished the case it was deciding from a case like the one at bar, for the very purpose of not deciding any case but the one before it, then proceeded to confuse the cases by using language which decided both. We cannot concur in such an interpretation of the opinion.

Counsel for the defendants also find in the language of Mr. Justice Peckham, in the case of U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 313, 326, 17 Sup. Ct. 540, an argument against our conclusion in this case. The question in that case was whether the antitrust act applied to railroad companies which combined in establishing traffic rates for the transportation of persons and property. It was vigorously contended on behalf of the railroad companies that the act was never intended to apply to them, because congress had already provided for their regulation by the interstate commerce law. In meeting this position, Mr. Justice Peckham used the following language (page 313, 166 U. S., and page 548, 17 Sup. Ct.):

"We have held that the trust act did not apply to a company engaged in one state in the refining of sugar under circumstances detailed in the case of U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, because the refining of sugar under those circumstances bore no distinct relation to commerce between the states or with foreign nations. To exclude agreements as to rates by competing railroads for the transportation of articles of commerce between the states would leave little for the act to take effect upon."

Again, upon page 326, 166 U. S., and page 553, 17 Sup. Ct., Justice Peckham repeats the same idea:

"In the Knight Co. Case, supra, it was said that this statute applied to monopolies in restraint of interstate or international trade or commerce, and not to monopolies in the manufacture even of a necessary of life. It is readily seen from these cases that, if the act does not apply to the transportation of commodities by railroads from one state to another or to foreign nations, its application is so greatly limited that the whole act might as well be held inoperative."

This is not a declaration that cases might not arise within the statute which were not combinations of common carriers in relation to interstate transportation. The language used. means nothing more than that, if such combinations were excluded from the effect of the act, the great and manifest scope for the operation of a federal statute on such a subject would be denied to it. To give the language more weight would be to violate the first canon for the construction of a judicial opinion laid down by Chief Justice Marshal in Cohens v. Virginia, 6 Wheat. 264, 340, 399:

"It is a maxim, not to be disregarded, that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason for this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all cases is seldom completely investigated."

In re Greene, 52 Fed. 104, cited for the defendants, is to be distinguished from the case at bar in exactly the same way as the Knight Co. Case. The indictment against Greene, drawn under the anti-trust act, charged him with being a member of a combination to acquire posession and control of 75 per cent. of the distilleries of the country, for the purpose of fixing the price of whisky, and controlling the trade in it between the states. The immediate object of the combination was a monopoly in manufacture. The effect upon interstate trade in whisky was as indirect as was the monopoly of the refining of sugar in the Knight Co. Case upon interstate trade in that article.

The case of Dueber Watch Case Mfg. Co. v. E. Howard Watch & Clock Co., 35 U. S. App. 16, 14 C. C. A. 14, and 66 Fed. 637, cannot be regarded as an authority upon either of the questions considered in this case, because of the division of opinion among the judges. It was a suit brought by a watch manufacturing company against 20 other companies to recover damages for a boycott of the plaintiff. The averment was that the defendants had agreed not to sell any goods manufactured by them to any person dealing with the plaintiff, and had caused this to be known in the trade, and that they fixed an arbitrary price for the sale of their goods to the public, and, because plaintiff's competition interfered with their maintaining this price, they were using the boycott against plaintiff, to stifle competition. The pleadings were not drawn with care to bring the case within the anti-trust law. The questions arose on demurrer to the bill. Judge Lacombe held that the facts stated gave rise to no cause of action; Judge Shipman held that the averments were not sufficient to show that the trade restrained was interstate; and Judge Wallace dissented, on the ground that a cause of action was sufficiently stated, and that the restraint was upon interstate commerce. These varying views decided the case, but they certainly furnish no precedent or authority.

There is one case which seems to be quite like the one at bar. It is the case of U. S. v. Jellico Mountain Coal & Coke Co., 46 Fed. 432, a decision by Judge Key at the circuit. The owners of coal mines in Kentucky entered into a contract of association with coal dealers in Nashville, by which they agreed that the mine owners should only sell to dealers who were members, and the members should only buy from mine owners who were members, and that the dealers should sell at certain fixed prices, of which the mine owners should receive a proportionate part, after payment of freight, and that prices might be raised by a vote of the association, in which case the addition to the price should be divided between the dealers and

the mine owners. The contract recited that it was intended to establish and maintain the price of coal at Nashville. It was held to be an attempt to create a monopoly in the interstate trade in coal between Kentucky and Nashville, Tenn., and it was enjoined.

It is pressed upon us that there was no intention on the part of the defendants in this case to restrain interstate commerce, and in several affidavits the managing officers of the defendants make oath that they did not know what interstate commerce was, and, therefore, that they could not have combined to restrain it. Of course, the defendants, like other persons subject to the law, cannot plead ignorance of it as an excuse for its violation. They knew that the combination they were making contemplated the fixing of prices for the sale of pipe in 36 different states, and that the pipe sold would have to be delivered in those states from the 4 states in which defendants' foundries were situate. They knew that freight rates and transportation were a most important element in making the price for the pipe so to be delivered. They charged the successful bidder with a bonus to be paid upon the shipment of the pipe from his state to the state of the sale. Under their first agreement, the bonus to be paid by the successful bidder was varied according to the state in which the sale and delivery were to be made. It seems to us clear that the contract of association was on its face an extensive scheme to control the whole commerce among 36 states in cast iron pipe, and that the defendants were fully aware of the fact whether they appreciated the application to it of the anti-trust law or not.

Much has been said in argument as to the enlargement of the federal governmental functions in respect of all trade and industry in the states if the view we have expressed of the application of the anti-trust law in this case is to prevail, and as to the interference which is likely to follow with the control which the states have hitherto been understood to have over contracts of the character of that before us. We do not announce any new doctrine in holding either that contracts and negotiations for the sale of merchandise to be delivered across state lines are interstate commerce (see cases above cited), or that burdens or restraints upon such commerce congress may pass appropriate legislation to prevent, and courts of the United States may in proper proceedings enjoin. In re Debs, 158 U. S. 564, 15 Sup. Ct. 900. If this extends federal jurisdiction into fields not before occupied by the general government, it is not because such jurisdiction is not within the limits allowed by the constitution of the United States.

The prayer of the petition that pipe in transportation under the contract of association be forfeited in a proceeding in equity like this is, of course, improper, and must be denied. The sixth section of the anti-trust act, after providing that property owned and in transportation from one state to another or to a foreign country under a contract inhibited by the act "shall be forfeited to the United States," continues "and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure and condemnation of property imported into the United States contrary to law." This requires a like procedure to that prescribed in sections

3309–3391, Rev. St., and involves a trial by jury. The only remedy which can be afforded in this proceeding is a decree of injunction.

For the reasons given, the decree of the circuit court dismissing the bill must be reversed, with instructions to enter a decree for the United States perpetually enjoining the defendants from maintaining the combination in cast-iron pipe described in the bill, and substantially admitted in the answer, and from doing any business thereunder.