UNITED STATES ex rel. GRIGGS, Atty. Gen., et al. v. CHESAPEAKE & O. FUEL CO. et al.

(Circuit Court, S. D. Ohio, W. D. August 31, 1900.)

No. 5,298.

1. MONOPOLIES—CONTRACTS AFFECTING INTERSTATE COMMERCE.

A contract by which a corporation agrees to take the entire product of a number of persons, firms, and corporations engaged in mining coal and making coke in a certain district, which is intended for "Western shipment," to sell the same at not less than a minimum price, to be fixed by an executive committee appointed by the producers, and to account for and pay over to such producers the entire proceeds above a fixed sum per ton, to be retained as "compensation,"—the stated purpose being "to enlarge the Western market,"—and under which the shipments are made into other states, is one affecting interstate commerce, and is subject to the provision of the anti-trust law.

2. SAME—ANTI-TRUST LAW.

It is the declared policy of congress to promote individual competition in relation to interstate commerce, and to prevent combinations which restrain such competition between their members; and it is no defense to an action to dissolve such a combination as illegal under the anti-trust law that it has not in fact been productive of injury to the public, or even that it has been beneficial, by enabling the combination to compete for business in a wider field.

3. SAME—COMBINATION IN RESTRAINT OF TRADE.

By a contract between a fuel company and an association composed of 14 persons, firms, and corporations, engaged in producing coal and coke in a certain district, the company was to handle for a term of years the entire output of the mines intended for the Western market, and bound itself not to sell the product of any competing mines. A minimum price at which the coal should be sold was to be fixed by the executive committee of the association from time to time, and the company agreed to pay such price, to obtain as large a profit as possible, and to account to the association for all of the same, above a fixed sum per ton, which it was to retain as compensation. The amount to be furnished by each member of the association was also to be fixed by the executive committee, and each was to receive payment at the same rate, to be based on the average price realized for the particular grade furnished during the current month. *Held*, that such provisions were in restraint of trade, and rendered the contract illegal, under the anti-trust act of July 2, 1890 (26 Stat. 209), in so far as it related to interstate commerce.

In Equity. Suit to annul a contract and to dissolve a combination as illegal under the anti-trust law.

Wm. E. Bundy, U. S. Atty., and Sherman T. McPherson and Edward P. Moulinier, Asst. U. S. Attys.

Paxton & Warrington, Brown, Jackson & Knight, St. Clair, Walker & Summerfield, and Richard P. Ernst, for defendants.

THOMPSON, District Judge. This suit was brought by the United States district attorney for this district, by direction of the attorney general of the United States. The bill alleges that the defendants, other than the Chesapeake & Ohio Fuel Company, 14 in number, are producers and shippers of coal, and that some of these are makers and shippers of coke in the counties of Fayette and Kanawha, in the state of West Virginia, in what is known as the "Kanawha District," and that they produce nearly if not all of the coal, and make nearly if not all of the coke, shipped from said district; that a

great portion of the coal and coke so produced and made is shipped for sale and consumption into the states of Ohio, Kentucky, Indiana, Illinois, Michigan, Minnesota, Montana, and the Dakotas; that prior to the 15th of December, 1897, each of the defendants, other than the Fuel Company, sold their product in the several states mentioned without any restriction other than the natural and necessary competition between themselves and others, but that on that day they entered into a contract and combination in the form of a trust and conspiracy in restraint of trade and commerce among the several states mentioned, in regard to the sale and production of coal and coke, of which the following is a copy:'

"This agreement, made this 15th day of December, 1897, between the C. & O. Fuel Company, a corporation created, organized, and existing under and pursuant to the laws of the state of West Virginia, and hereinafter called the 'Fuel Company,' of the first part, and the St. Clair Company, a corporation of West Virginia; John Carver and Enoch Carver, partners in business under the firm name and style of Carver Brothers; W. R. Johnson, M. T. Davis, doing business as M. T. Davis & Co.; John Carver and Enoch Carver, partners in business under the firm name and style of the Mecca Coal and Coke Company; S. H. Montgomery, doing business under the name of the Montgomery Coal Company; the Chesapeake Mining Company, a corporation of West Virginia; the Belmont Coal Company, a corporation of West Virginia; the Kanawha Splint-Coal Company, a corporation of West Virginia; the Robinson Coal Company, a corporation of West Virginia; Harry B. Smith, special receiver of the Lens Creek Coal and Coke Company; Joseph Renshaw, special receiver of the Big Black Band Coal Company; the Charlmore Coal Company, a corporation of West Virginia; and Robert Brabbin, Jr., and L. N. Perry, partners in business under the firm name and style of the Brabbin Coal Company; Jasper McCallister, Samuel Moore, and James Kelsoe, doing business as McCallister & Co.,—and together constituting the C. & O. Coal Association, and hereinafter collectively mentioned as the 'Coal Association,' of the second part: Whereas, the members of the said Coal Association are all miners and shippers of coal, and part of them makers and shippers of coke, on the line of the Chesapeake & Ohio Railway, in Fayette or Kanawha counties, West Virginia, and have formed and organized said association for the promotion of their common business interests in the mining of Kanawha coals and cokes; and whereas, the said Fuel Company has been incorporated and organized for the purpose of placing said Kanawha coals and cokes upon the Western market, its prime object to promote the sale of, and enlarge the Western market for, said coals and cokes: Now, therefore, this agreement witnesseth:

"(1) That the parties of the second part agree, in consideration of the covenants and agreements on the part of the party of the first part herein contained, each firm, individual, or corporation severally, for themselves, himself, or itself, and not for any other, and each of them doth hereby agree, to sell to the said Fuel Company exclusively the entire coal and coke output of the mine or mines operated by each of them respectively on said C. & O. Ry., or branches thereof, for Western shipment, for a period of not less than five years from and after the date of January, 1898, subject to all the provisions, terms, and conditions hereinafter contained, except as to such coal as may be sold by any member of said Coal Association to the Chesapeake & Ohio Railway Company for the consumption of said railway company, which said coal such member shall have the right to sell to said railway company direct, it being understood that this contract applies only to the coal and coke to be sold west of the respective mines of the members of said Coal Association, and shall not in any way apply to or interfere with the Eastern trade of the members of said association.

"(2) The minimum price f. o. b. mines of all the various grades of coal and coke sold and to be shipped West by the members of said association, and embraced in this contract, shall be fixed by the executive committee of said Coal Association from time to time, as it shall see proper, after consultation with the executive committee of the Fuel Company. The said Fuel Company

covenants, agrees, and binds itself that it will make no contract for the sale of any coal or coke of any members of said association at a price lower than such minimum prices to be fixed by such committee, and, further, that it will at all times endeavor to obtain the maximum price for such coal and coke. It is understood and agreed that the minimum prices hereinbefore mentioned are net prices f. o. b. mines, and not'including any profit to the said Fuel Company, which is to get its profit over and above said prices.

"(3) That the said Fuel Company shall make its sales direct, and shall not make any contract for the sale of coal and coke to a third party in the name of any member of the said Coal Association, and shall have no right by any contract to bind any member of said association to any third party, except for river business, as hereinafter provided for.

"(4) The executive committee of said Fuel Company, who shall administer and have charge of its affairs, shall be composed of three (3) persons, one of whom shall at all times be a member of or officer of a member of said Coal Association, and shall from time to time, according to the by-laws or articles of association of said association, be designated as a member of such executive committee, and shall thereupon be appointed such member of such executive committee by said Fuel Company in the place and stead of the member of or officer of a member of said Coal Association previously occupying such office. The executive committee of said Coal Association shall consist of three members of or officers of members of said Coal Association, to be selected as such from time to time by the members of said Coal Association according to their by-laws or articles of association.

"(5) The said Fuel Company covenants, agrees, and binds itself to sell for shipment by rail via the said Chesapeake & Ohio Railway, and pay for to the members of said Coal Association as hereinafter agreed, not less than 600,000 tons per annum of coal and 75,000 tons per annum of coke: such sales and shipments to be disposed of in as nearly equal monthly quantities as possible. But in case said Fuel Company is unable for any time to make sales of coal or coke by reason of the failure or inability of the members of said association to make prices sufficiently low to enable said Fuel Company to meet the prices in the market where said coal or coke is sought to be sold, and to compete with other sellers of coal or coke in such markets, then there shall be an abatement of the minimum amount of coal or coke hereinbefore agreed to be taken annually by said Fuel Company, bearing the same proportion to such minimum amount of coal or coke as such time during which such inability to meet such market prices shall continue does to one year. The executive committee of said Coal Association shall, not later than the 20th day of each month, designate the percentage of the total product of each class and grade of coal and coke which they deem best to be shipped by each member of said association by rail as aforesaid during the succeeding month, which apportionment so made shall be furnished the general manager of said Fuel Company not later than the 20th day of said first-mentioned month, and all orders received to be shipped by rail as aforesaid during such succeeding month shall be distributed between the members of said Coal Association by said general manager according to such apportionments: provided that, if any member of said Coal Association shall be unable or shall not desire to ship West the full amount of any kind or grade of coal or coke apportioned to such member for any month, the said Fuel Company shall distribute the order for the deficiency so caused among the other members of said association who are shippers of such grade of coal or coke, in the proportion as between such other members fixed by said committee for such month: provided, further, that only actual inability shall excuse a member of said association from shipping so much of the apportionment for any month shall be required by the said Fuel Company for contribution to contracts previously taken by said Fuel Company.

"(6) The said Fuel Company shall make and render to the members of the Coal Association accurate and complete reports of all coke and coal shipped by rail as aforesaid, as follows: (a) A daily report of all sales, showing the net prices of such sales. (b) A monthly report showing the tonnage of the various kinds and grades of coal and coke shipped by members of said Coal Association and weighed during the month, or weighed during such month though shipped during a preceding month, together with the average price

for each grade or kind of coal or coke so shipped and weighed, which average price shall be computed upon the basis of the actual price, less gr ss profits, if any, received for all coal or coke sold, and the minimum price, fixed as hereinafter provided, for such month for coal or coke not sold in such month; said report to be'made not later than the 10th day of each month for all coal and coke weighed, or weighed during the previous calendar month. The coal and coke shipped and weighed or -weighed during such month shall be paid for by said Fuel Company to the members of said Coal Association according to the average prices, 'determined as aforesaid, and upon the sale after the end of each month of any coal or coke shipped and weighed, or weighed but not sold during such month, the surplus, if any, arising after deducting from the actual price received the minimum price for such kind and grade of coal or coke for such month and profit shall be paid forthwith to the shippers of such grade of coal or coke for such month according to their tonnage of such kind or grade of coal or coke for such month. And the said Fuel Company agrees and binds itself to pay as aforesaid, in cash, on or before the 20th day of each month, for all coal and coke during the previous calendar month.

"(7) The said Fuel Company further covenants, agrees, and binds itself to handle only such coal and coke as are produced by the above-mentioned members of said Coal Association, and not to handle, buy, or sell, for itself or on commission, any coal or coke produced by any other operator along said Chesapeake & Ohio Railway or branches thereof, or any coal or coke wherever produced, of the same grade as, or competing with, coal or coke produced by any of the members of said association, the prime object of this contract being to enlarge the sale of, and extend the Western market for, Kanawha coal and coke; and this shall not prevent the said Fuel Company from dealing in anthracite coal or New River coal or coke: provided, that New River coal or coke shall not be dealt in to the prejudice of, or sold as a substitute for, Kanawha coals and cokes: and provided, further, that in an emergency, and when absolutely necessary, other coals and cokes may be handled by said Fuel Company to meet such emergency. But no' dealing in such anthracite, New River, or other coal or coke shall be done by said Fuel Company to an extent or in a manner incompatible with the prime object of this agreement, as hereinbefore recited.

"(8) That at any time, by a vote of two-thirds (⅔) of the members of said Coal Association, said Fuel Company may be allowed to handle any other coal or cokes for such time and upon such terms and conditions as may be prescribed by such vote.

"(9) The said Fuel Company is to receive a gross profit on all rail coal and coke sold, which shall not exceed ten (10) cents per ton of two (2,000) thousand pounds on any sale, which compensation shall be retained by said Fuel Company out of the monthly settlements of coal and coke sold; the true intent and meaning of this clause being that the Fuel Company shall get its profit over and above the net minimum price of said coal and coke f. o. b. mines as hereinbefore fixed, and, if the price at which said coal and cokes is sold by said Fuel Co. shall be sufficient to yield a sum exceeding said minimum price and gross profit of ten (10) cents per ton as aforesaid, then the difference shall be paid over to the members of said association in the manner and at the time hereinbefore mentioned, as they may be entitled under this agreement, as part of the purchase price to be paid for coal and coke by said Fuel Co.

"(10) The members of said association shall not be required to mine and ship coal when hindered or prevented by causes beyond their own control, such as strikes, accidents, refusal or inability of the carrier to provide transportation, &c.

"(11) The said Coal Association shall have the right once per month, through a committee not exceeding three in number, or a person designated by said committee, to examine the order, sales, and tonnage books of said Fuel Company.

"(12) The coal or coke of members of said Coal Association shipped in barges by river shall be handled by the said Fuel Company, as an agent, on the same terms and under the same conditions as are now established or may be hereafter established and prevail in Cincinnati market for the sale of river

coal, but the said Fuel Company shall not make time sales or extend credit without the consent of the shippers of such coal.

"(13) All settlements for coal or coke shipped by rail as aforesaid shall be made upon the scale weights of the Chesapeake & Ohio Railway Company, as ascertained at its weighing stations now established or that may hereafter be established.

"(14) It is distinctly understood that nothing herein contained shall be construed to render the said members of said association liable as partners, in any way, manner, or form, either as between themselves or with the said Fuel Company; each of said firms, corporations, and individuals contracting herein for themselves, itself, or himself, and not one for the other.

"(15) The said Fuel Company further covenants, agrees, and binds itself that neither it nor any of its officers, employés, or servants will, with its knowledge, directly or indirectly, in any way, manner, or form, engage or become interested in the buying or selling of bituminous coal or coke in competition with the coal or coke of any of the members of said Coal Association, except under the terms and conditions of this agreement.

"(16) The members of said Coal Association above named, each for himself, itself, or themselves, and not one for the other, covenant and agree that the said members of said association will not sell or consign any coal or coke bound to points west of their respective mines, except under the terms and conditions of this agreement, during the period covered by this agreement, and that there shall be no pretended sale or lease of the property of the members of the said association made to evade this contract; but it is further understood and mutually agreed that this contract shall not be construed to prevent any bona fide sale, assignment, or lease of the respective properties operated by the members of said association, respectively, or the interest therein of any member of said association. And in case of such sale, assignment, or lease, the members of said association are not to be held responsible under this contract for the sale and delivery of any coal from such properties after such sale, assignment, or lease takes place. But in case the vendee, assignee, or lessee of any coal or coke property of any member of the Coal Association desires, he shall have the right to take the place of such member in this agreement.

"(17) And whereas, some of the members of said association have contracts for the sale of coal or coke, which cannot be completed until after this agreement goes into operation; and whereas, it is to the advantage both of such members and of said Fuel Company that such contracts be filled through said Fuel Company, it is further agreed that the members of said association having existing contracts to be completed during the period of this agreement shall on or before the 24th day of December, 1897, file with the general manager of said Fuel Company a memorandum of each of said contracts, and such of said contracts as are uncompleted on the first day of January, 1898, shall be completed through said Fuel Company; the Fuel Company to make no charge for its services in connection with such contract and collecting the proceeds of the same; said Fuel Company not to guaranty the collection of such proceeds, or be responsible for same unless collected by it. Such coal or coke so shipped on existing contracts shall not be taken into account in any way as a part of the traffic hereinbefore provided for in this contract, nor its prices taken into account in computing the average price for any month, but such as shall be shipped by rail shall be considered part of the minimum tonnage mentioned in the fifth clause of this agreement for the year in which it is shipped.

"(18) The said Fuel Company shall keep at its own expense one or more inspectors to examine and inspect from time to time, as often as may be necessary, the coal and coke produced, with a view of keeping up a proper standard of excellence. Should said inspector find coal or coke badly or improperly prepared, he shall immediately report all the facts in writing to the Fuel Company and to the operator preparing such coal or coke, and shipments from mine or mines producing such alleged improperly prepared coal or coke may be suspended after five (5) days' notice in writing to such operator, at the discretion of the executive committee of the Fuel Company, until such time at such operator may prepare such coal or coke properly. In any case such

105 F.—7

operator shall have the right to refer the question whether such coal or coke is improperly prepared or not, or, if not so prepared, whether the same be so prepared at reasonable cost, to arbitration, as herein provided, which decision as to the preparation of such coal shall be final and binding on both parties; and in case said arbitration shall find such coal or coke improperly prepared, and shall further find that it is impossible or impracticable for such operator to remedy such faults at reasonable cost, he shall have the right to withdraw from, and have this agreement annulled as to him. If said Fuel Company shall make default in payment for any coal or coke sh'pped under this agreement according to the terms hereof, and said default shall continue for the space of fifteen (15) days, unless payment shall be withheld by reason of attachment, suggestion, garnishment, or other legal process against the member of said Coal Association on whose claim default is so made, such default shall, at the option of such member on whose claim such default it is so made, work an annulment of this contract as to such member: provided such member shall within ten (10) days after the expiration of said fifteen (15) days give notice in writing to said Fuel Company of the election of such member to exercise such right of annulment; and a failure to exercise this right for any such default shall not prevent the exercise of the same for any subsequent default. And a violation or failure to keep, observe, and perform any covenant or covenants herein contained by any party to this agreement shall, at the option of the party or parties thereby aggrieved, work an annulment of this agreement as to such party or parties on thirty (30) days' notice in writing. And no waiver of this right, in case of any violat'on or failure to keep, observe, and perform any covenant hereof, shall prevent the exercise of the same for any subsequent violation of, or failure to keep, observe, and perform, the same, or any other covenant hereof; provided, that upon any notice for the annulment of this agreement as hereinbefore provided being given by any parties or party, the party or parties to whom it is so given, if desiring to contest the rights of the parties or party giving said notice to annul this agreement, shall have the right to submit the question to arbitration, as herein provided, and the decision of such arbitrator shall be final and binding on all parties to such arbitration. But any withdrawal or annulment as to any member or members under this, or clause No. 18 hereof, shall not affect this contract as to the parties remaining, between themselves.

"(19) Any person, firm, or corporation now or hereafter producing coal to be shipped on the Chesapeake & Ohio Railway may become a party to this contract by signing the same, or an exact copy hereof, with the Fuel Company, or by an indorsement attached hereto may accept the provisions hereof; and, upon becoming such party hereto, such person, firm, or corporation shall be entitled to all the rights and privileges, and be subject to all the duties and liabilities, hereunder, the same as if he, it, or they had been named in said contract as one of the parties of the second part, and had duly signed and executed it with the others named therein: provided, that said association shall agree to such person, firm, or corporation becoming a party hereto by a majority vote of a quorum of its members.

"(20) It is understood and hereby agreed that in any matter or thing connected with this agreement, where any party hereto shall assert, maintain, or set up any claim, right, privilege, liability, or penalty in his, its or their favor, or against any other party or parties hereto, and thereby a controversy shall arise hereunder, then and in that event either party or parties to such controversy shall have the right to submit the said controversy to arbitration in the manner hereinafter set forth. There is hereby constituted and appointed an arbitration committee, which shall be composed of two persons and such third person as shall be by such two selected from time to time as any controversy may arise. Such two persons shall be selected as follows: Each and every year during the continuance of this contract the said Fuel Company shall appoint some person to serve upon said arbitration committee, and the parties of the second part shall also appoint one to serve upon said committee, of which appointment the Fuel Company and the association shall have notice, and the two persons so appointed shall continue to serve until their successors shall be appointed in the same manner. Whenever a controversy shall arise hereunder, the party desiring to submit such controversy shall notify the other party or parties to such controversy of the same, in

writing, and shall designate in such notice the time and place when said two arbitrators shall meet to hear the matter in controversy, and he or they shall also notify the said arbitrators to meet at said time and place. And at the time and place so designated said two arbitrators shall meet, and they shall select a third arbitrator, who, with the other two, shall constitute the full arbitration committee to hear and determine the said controversy, and whose award in all matters of law and fact shall be final, and shall be binding upon each and all of the parties to that controversy. Such notice may be served as a legal notice is served, or it may be mailed to the party, to be served at his or their post-office address. And any notice to any one or more of the parties of the second part may be served upon or sent by mail to the president and secretary of said association. If at the time and place said two arbitrators are required to meet, either one or both of them should fail or refuse to attend or serve, then the Fuel Company, by its agent or attorney, on the one side, may fill the vacancy caused by its arbitrator being absent or refusing to serve, and the association, by its officer, agent or attorney, may fill the vacancy caused by the absence of its arbitrator or his refusing to serve; and the arbitrator or arbitrators so selected by either or both of said parties as aforesaid shall select the third, which three shall, for that controversy, constitute the arbitration committee, and shall have the same powers, and their award shall be as final, as if the two arbitrators herein first provided for had attended and selected a third. If, upon having notice to attend at a time and place to settle a controversy, either party shall fail or refuse to attend, or shall fail or refuse to select an arbitrator when required hereunder so to do, the said association by its president, other officer or attorney, may select an arbitrator in the place or stead of the absent one; and, if such association shall fail or refuse to make such appointment, in that event the Fuel Company, by its agent or attorney, may make such appointment or appointments, and the two when so appointed in any of said modes shall select a third, and the three shall constitute the arbitration committee to hear and determine said controversy, whose award shall be final. A notice to arbitrate hereunder shall not fix a time longer than fifteen (15) days nor less than five (5) days from the time of giving said notice, unless by mutual consent. The place of such meeting of the arbitrators shall be at Cincinnati, Ohio, or Charleston, W. Va., unless by mutual consent. Said arbitrators shall have the right to adjourn their session from time to time or to such place or places as they may determine. And they shall make their award in not less than three days from the time the evidence is finally taken before or submitted to them; such award to be valid if signed by two of the arbitrators. Every award shall be executed in duplicate, and a copy thereof furnished to each of the executive committees herein mentioned. The failure of a regular arbitrator to attend at a time and place designated in any notice to him, and the appointment of another in his stead for any controversy, shall not for that reason vacate his general appointment as an arbitrator until his successor is appointed. If the two arbitrators appointed as above provided shall at any time fail or refuse for two days to appoint the third arbitrator, the latter shall be appointed by the judge of the circuit court of Kanawha county, West Virginia.

"Witness the following signatures:

"The C. & O. Fuel Co., Donald Macdonald, Pt.
"Robinson Coal Co., by Neil Robinson.
"W. R. Johnson.
"The Kanawha Splint-Coal Company, by F. E. Lair.
"Carver Bros.
"Enoch Carver.
"Jos. Renshaw, Special Receiver Big Black Band Coal Co.
"Charlmore Coal Co., Herndon & Renshaw, Mgrs.
"McCallister & Co., per James Kelsoe.
"Mecca Coal & Coke Co., by John Carver.
"Chesapeake Mining Co., by J. B. Lewis.
"Coalburg Colliery Co., by J. B. Lewis.
"Montgomery Coal Co., by S. H. Montgomery.
"Belmont Coal Co., by T. E. Embleton, Pt.
"Harris B. Smith, Spl. Receiver Lens Creek Coal & Coke Co."

—That this contract went into effect on the 1st day of January, 1898, and that the defendants, acting thereunder, monopolized and controlled the amount of coal and coke produced in the Kanawha district, and only permitted such amount of coal to be mined and coke to be made as could be sold by the Fuel Company in accordance with the provisions of the contract, the producers being permitted to ship only such amounts as should be apportioned among them by an executive committee of three selected by members of the association; that the defendants, acting under said contract, not only controlled the amount of coal and coke shipped into the states mentioned from the Kanawha district, but wholly destroyed competition in the sale of the same. And it is alleged generally that the said contract, and the operations thereunder, constitute an unlawful combination, in the form of a trust, in restraint of trade and commerce among the said several states, and that said defendants have combined and conspired with one another to monopolize, and have attempted to monopolize, by reason of said contract, and their acts and operations thereunder, a part of the trade and commerce in coal and coke among the said several states, all in violation of the act of congress of July 2, 1890. And the prayer of the bill is that the defendants be restrained from selling or shipping any coal or coke into any state, other than the state in which they reside, under said contract, and that they be restrained from continuing in any like combination or agreement, and from further agreeing and combining and acting in any manner as set out in said contract, and that the contract be declared void and illegal, and that said trust and combination be dissolved by decree of the court.

At the hearing no evidence was introduced by the complainant, but the case was submitted upon the bill and answer, and the evidence introduced by the defendants. The circumstances under which the contract was made, and the facts in relation to the operations of the defendants thereunder, as shown by the allegations of the answer and the evidence, are, in substance, as follows: The defendants other than the Fuel Company are owners of coal mines and producers and shippers of coal, and some of them are makers and shippers of coke. Their mines and coke plants are situated along the line of the Chesapeake & Ohio Railway, in the counties of Fayette and Kanawha, in the state of West Virginia, and in the territory known as the "Kanawha District." The counties of Fayette and Kanawha embrace nearly all of the district. A part of Putnam county is within this district. Besides the mines of the defendants, there are in the same district, on the Chesapeake & Ohio Railway, or south side of the Kanawha river, the mines of the following companies, viz.: The Great Kanawha Colliery Company, the Mt. Carbon Company, Limited, the Diamond Mine, the Forest Hill Coal Company, the East Bank Coal & Coke Company, the Polsue Coal Company, the Coalburg Colliery Company, the Stevens Coal Company, the Acme Mines, the Coal Valley Mining Company, and the Winifrede Coal Company,—and on the Kanawha & Michigan Railway, or north side of the river, the Boomer Mine, the Long-Acre

Mine, the Harwood Mine, the Cannelton Coal Company, the Kelly's Creek Coal Company, the Riverside Coal Company, the Peal Splint-Coal Company, the Marmet-Smith Company, the Plymouth Mines, and the Big Mountain Operating Company. The capacity of the mines of the defendants is about 4,800 tons of coal a day, and of the other mines on the same side of the river about 4,300 to 4,500 tons a day. The defendant coke producers make about 440 tons a day, and the other coke producers of the district about 300 tons a day. Some of the defendants operate mines on both sides of the Kanawha river, but none of the mines on the north side are covered by the contract in question. Macdonald, the president of the Fuel Company, prior to the organization of that company and the making of the contract had been engaged in selling coal and coke in Cincinnati and its vicinity from mines along the Chesapeake & Ohio Railway; but the Fuel Company, under the contract, has been selling coal and coke in West Virginia, Kentucky, Ohio, Indiana, Illinois, Michigan, Wisconsin, Missouri, Iowa, Nebraska, North Dakota, South Dakota, Arizona, and Mississippi. The extent and the places of the Western shipment by the defendants, other than the Fuel Company, prior to the making of the contract, are not shown; but the answer alleges that they "had no trade whatever in most of said states, and had very little in the others, except in Cincinnati, Ohio." The other districts and localities competing with the defendants in the Western market are: The New River fields, of West Virginia, with the capacity of about 2,000 tons of coke a day; the Flat Top fields, of West Virginia, on the Norfolk & Western Railway; the fields along the Baltimore & Ohio Railway, the West Virginia & Pittsburg Railroad, and the Ohio, West Virginia & Pittsburg Railroad, in West Virginia; the coal fields of Western Pennsylvania; the Hocking, Wellston, and Nelsonville coal fields, of Ohio; and the coal fields of Kentucky, Tennessee, Illinois, Iowa, and Missouri. The aggregate production of all these fields is said to be 115,000,000 tons of coal annually. The defendants' shipment West in 1897 was about 450,000 tons. In 1898 it was about 550,000 tons of coal and from 60,000 to 65,000 tons of coke. The twelfth clause of the contract, in relation to coke and coal shipped by river, was rescinded in June, 1898. Prior to the making of the contract there was a lack of uniformity in the preparation of coal and coke. Under the contract this has been remedied, and the quality of the product has been improved. The minimums of coal and coke which the Fuel Company was required to take and pay for, as provided in the fifth clause of the contract, was in excess of the production of the defendants' mines during the year preceding the making of the contract; the excess of coal being about 60,000 tons, and of coke about 30,000 tons. A man employed by the producers, the defendants other than the Fuel Company, and known as the "equalizer," makes the distribution of orders and cars to the shippers. About 3,000,000 tons of coal is shipped East over the Chesapeake & Ohio Railway from the New River and Kanawha districts annually. What portion is shipped from the Kanawha district does not appear. The facilities for placing coal and coke on the Western

market have been increased by the operation of the contract, and the monthly payments by the Fuel Company have relieved the operators from losses by bad debts, and have furnished the means for promptly paying the men in their employ. River shipments from the whole Kanawha district are double the shipments of defendants by rail. Prior to making the contract, single operators were sometimes not able to take and fill large contracts. It does not appear that under the contract prices have been materially increased or diminished, but have been maintained.

Two questions have been presented: (1) Does the contract in question relate to interstate commerce? (2) And, if so, will its performance restrain interstate commerce, within the meaning of the act of congress known as the "Anti-Trust Law"?

1. If it be assumed that the Fuel Company was to become the purchaser of the coal produced by the other defendants, and not their agent for its sale to others, with an interest in the profits, yet by the terms of the contract the coal and coke are to be delivered to the Fuel Company for "Western shipment,"—to markets in states other than West Virginia,—there to be sold for not less than a minimum price to be fixed by the executive committee of the association; and the Fuel Company is required to account and pay over to the members of the association all profits made over and above 10 cents per ton, which it is to retain as "compensation" for the use of its capital and for its services. The contract, read in the light of the circumstances under which it was made, shows that it contemplates and provides for the sale of coal and coke in states other than West Virginia; and the evidence shows that, in the performance of the contract, coal and coke have been sold in the states mentioned in the bill. Indeed, the prime object of the contract, as repeatedly expressed therein, is "to enlarge the sale of, and extend the Western market for, Kanawha coal and coke." The contract, therefore, and the combination thereunder formed by the defendants, have direct relation to interstate trade and commerce, and in carrying out its purpose interstate commerce has been directly affected.

2. This being so, the question is whether the provisions of the contract which give exclusive control of the output of the mines to the Fuel Company; which prohibit competition between the members of the association; which prohibit the Fuel Company from handling competing coals and cokes; which authorize the executive committee of the association to apportion to its members the class, grade, and quantity of coal and coke to be shipped each month; which fix a minimum price below which the Fuel Company is prohibited from selling coals and cokes in the Western market; and which fix the settlement price between the Fuel Company and the association by a method of monthly averages,—are lawful regulations for the conduct of the business of the defendants, or whether they are regulations in restraint of interstate commerce, as charged in the bill. It is claimed by the defendants "that restriction of competition among only a small proportion of the coal and coke operators or other producers of a particular state, which is ancillary to a main, lawful purpose, and which in fact results in

keener and larger competition and greater freedom and volume in interstate trade and commerce, violates no provision of the federal anti-trust act." The "main, lawful purpose" to which the noncompetitive features of the contract are ancillary, as claimed by the defendants, is "to enlarge the sale of, and extend the Western market for, Kanawha coal and coke." But, as is well said in the Addyston Case, "no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party." U. S. v. Addyston Pipe & Steel Co., 29 C. C. A. 151, 85 Fed. 282, 46 L. R. A. 131. Here no relationship between the parties to the contract exists which calls for the protection of the Fuel Company against the association, by the enforcement of the noncompetitive clauses of the contract. The alleged main purpose of the contract is a provision mainly for the benefit of the association, and incidentally for the benefit of the Fuel Company, by enabling it to earn a commission on sales; and the enforcement of the noncompetitive clauses of the contract would benefit the parties accordingly, but would afford no counterbalancing benefits to the public. It is said, however, that the increase in the volume of trade, the competition in a larger field of operations, the better condition of the product, and the maintenance of reasonable prices, resulting from the performance of the contract, benefit the public, and justify the partial restraint of trade. But the policy of the law looks to competition, as the best and safest method of securing these benefits, and not to combinations which restrain trade. It is opposed to the methods of combination, and will not suffer competition to be destroyed under the pretense that the public will be better served by combination. In the exercise of the power of regulation conferred upon it by the constitution, congress has chosen competition, in preference to combination, as the best factor for the maintenance of the life and the promotion of the ends of interstate commerce, and has prohibited "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states, or with foreign nations," and has declared that "every person who shall monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states or with foreign nations, shall be deemed guilty of a misdemeanor." Now, it is provided in the contract in question that the Fuel Company shall have exclusive control of "the entire coal and coke output of the mine or mines operated by each of them [members of the association], respectively, on said C. & O. Railway, or branches thereof, for Western shipment, for a period of not less than five years, * * * except as to such coal as may be sold by any member of said coal association to the Chesapeake & Ohio Railway Company for the consumption of said railway company"; and it is provided further "that the said members of said association will not sell or consign any coal or coke bound to points

west of their respective mines, except under the terms and conditions of this agreement, during the period covered by this agreement," and that the Fuel Company, "nor any of its officers, employés, or servants, will, with its knowledge, directly or indirectly, in any way, manner, or form, engage or become interested in the buying or selling of bituminous coal or coke in competition with the coal or coke of any of the members of said Coal Association, except under the terms and conditions of this agreement." And it is further provided that the minimum price shall be fixed by the executive committee of the association for "all the various grades of coal and coke sold and to be shipped West by the members of said association," and that the Fuel Company "will make no contract for the sale of any coal or coke of any members of said association at a price lower than such minimum price to be fixed by such committee." And it is further provided "that the Fuel Company shall make a monthly report showing the tonnage of the various kinds and grades of coal and coke shipped by members of said Coal Association and weighed during the month, or weighed during such month though shipped during a preceding month, together with an average price for each grade or kind of coal or coke so shipped and weighed, which average price shall be computed upon the basis of the actual price, less gross profits, if any, received for all coal or coke sold, and the minimum price, fixed as hereinafter provided, for such month, for coal or coke not sold in such month; said report to be made not later than the 10th day of each month for all coal and coke weighed, or weighed during the previous calendar month. The coal and coke shipped and weighed or weighed during such month shall be paid for by said Fuel Company to the members of said Coal Association according to the average prices determined as aforesaid." And it is further provided that the executive committee of the Coal Association "shall, not later than the twentieth day of each month, designate the percentage of the total product of each class and grade of coal and coke which they deem best to be shipped by each member of said association by rail as aforesaid during the succeeding month." Under these provisions the extent of the production of the mines, the shipment and sale of the product, and the making and regulation of the prices thereof, are subject to the control of the executive committee of the association. All competition among the members of the association in the production, shipment, and sale of their product is eliminated, and the combination enters the Western markets clothed with powers which enable it to exercise a large influence in those markets in regulating the supply and the prices of coal and coke. These provisions are in restraint of trade, and tend to monopoly, within the meaning of the act of congress, and render the contract illegal, in so far as it relates to interstate commerce. The important question is not whether the performance of the contract so far has resulted in actual injury to trade, but whether the contract confers power to regulate and restrain trade, upon those charged with its performance. The attempt to confer power to regulate and restrain interstate commerce by contract is a usurpation of the functions of congress, and

cannot be sustained upon the ground that trade has not in fact been injured. It is for congress to determine what regulations of trade will best promote the public good. It is the policy of congress to encourage and promote individual effort. It looks to individual competition, rather than to combinations, for the benefits which are to follow and flow from commerce between the states, and, in the exercise of its constitutional power, has prohibited all combinations which restrain trade. It is for congress to determine whether the policy it has adopted shall be maintained as the one which will best promote the interests of the country, or whether it shall abandon that policy and place the interstate commerce of the country in the hands of combinations. But until congress takes that course, as long as this act remains upon the statute books, it is the duty of the courts to condemn every contract which necessarily in its performance involves a restraint of trade, although it may not extend to the point of a monopoly of all that trade. The recent discussion of these questions in the cases of U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; U. S. v. Joint-Traffic Ass'n, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; U. S. v. Addyston Pipe & Steel Co., 29 C. C. A. 141, 85 Fed. 271, 46 L. R. A. 122; Id., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, render their further discussion here unnecessary. The contract in question here, and the combination of the defendants thereunder, are in restraint of trade and commerce among the several states, and such trade has in fact been restrained in the performance of the contract; and the defendants, and each of them, therefore, will be enjoined from selling or shipping under this contract coal or coke into any state other than the state in which they reside, and the contract, in so far as it affects interstate trade and commerce, is declared to be void and illegal, and the combination of the defendants thereunder will be dissolved.